[Civ. No. 23975. First Dist., Div. Four. Jan. 25, 1968.]

ROBERT E. MATTSON et al., Plaintiffs and Respondents, v. COUNTY OF CONTRA COSTA et al., Defendants and Appellants.

John A. Nejedly, District Attorney, James H. Disney and Jeffrey D. Polisner, Deputy District Attorneys, for Defendants and Appellants.

Betts & Dean and William J. Betts for Plaintiffs and Respondents.

DEVINE, P. J.—The question is whether an agreement made between respondents, partners in the restaurant business, and the City of Concord relating to the use of property and the operation of refreshment services at the clubhouse at the municipal golf course creates a taxable possessory interest in respondents. Respondents sued to recover taxes paid under protest to the County of Contra Costa and recovered judgment in the amount of $151.53 for the tax period 1964-1965. The trial judge concluded that the agreement created a license only and not a possessory interest.

The agreement refers to respondents as concessionaires, and does not use the words "lessees" or "tenants." But the descriptive words used are not controlling.[1] (*Beckett* v. *City of Paris Dry Goods Co.*, 14 Cal.2d 633 [96 P.2d 122].)

The agreement was made while the clubhouse was being built on land owned or partially leased by the city. It gives to respondents the exclusive right to serve food, beverages, confectionery, tobacco products, and the like for five years, with

---

[1]The city manager in his testimony referred, at one point, to the agreement as a "lease" and counsel for respondents called the monthly payments "rent." We do not hold respondents to these words, but neither do we regard the nomenclature used in the agreement as binding.

first refusal to any new agreement on the same matters. Respondents are to pay 5 percent of the gross receipts, less sales taxes, to the city. The agreement says that the city's percentage shall commence with the first day of the 13th month "next following the month during which Concessionaires take possession of the restaurant and dining room area."

A faithful performance surety bond must be posted by respondents; respondents must maintain workmen's compensation and liability insurance to cover damages arising from injuries to persons or property "arising out of the operation of the concession." Respondents must keep "all premises operated by them" under the agreement in good order and repair, including plumbing and all glass on said premises. All necessary items for the business (utensils, etc.) and licenses are to be obtained by respondents. Utilities are paid for by the city.

Termination provision is this: the city council reserves the right at any time "when the method of operation of said concession or the quality and character of service rendered by Concessionaires are not fully up to the requirements of this agreement or are not adequately meeting the needs of the public for reasons properly within the control of Concessionaires, or in case Concessionaires violate any of the terms of this agreement, to terminate this agreement, first giving thirty (30) days' notice, in writing, of its intention to do so. If the monthly payments convenanted to be made by the Concessionaires shall at any time during the term of this agreement become fifteen (15) days past due, the City, at its option, shall have the right to terminate this agreement. In the event of such cancellation, City agrees to pay Concessionaires the pro-rata cost for the remaining period of the agreement for equipment installed by Concessionaires, if Concessionaires so desire, and said equipment shall then become the property of the City of Concord."

There are expressed certain terms relating to the operation of the restaurant and vending business. The restaurant must be open shortly before sunrise and remain open until shortly after sunset on all days when the golf course is open; the quality of food and service must be equal to that of the better neighboring restaurants; prices shall be reasonably comparable to those in restaurants in the City of Concord and at golf courses in the Bay Area, and price adjustments shall be submitted to the city manager; advertisements of particular

foods or beverages are not permitted, and all advertisements are subject to the city manager's approval. If the city manager deems any operation to be detrimental, it shall be stopped; and if he deems equipment to be unsafe, it shall be withdrawn. Any employee who in the judgment of the city manager is objectionable shall be discharged immediately.

There was testimony, uncontradicted, about the actual operation of the enterprise. The kitchen and storeroom are possessed exclusively by respondents. One of the Mattson partners testified that the law requires that others than authorized personnel be barred from the kitchen area.[2] The dining area is open to the public. Tables and chairs have been put there by respondents. These are used by customers, but golfers and others who are tallying scores, playing cards, or watching television may sit in the room although they may purchase nothing.

Several vending machines have been contracted for by respondents and placed by them in the dining and patio areas. This installation was known to the city manager although his express permission for it was not requested. The 5 percent allotment is remitted from receipts from the machines.

Some of the improvements are particular or unique to respondents' operation and are not usable elsewhere.

"All property . . . not exempt . . . shall be taxed in proportion to its value." (Cal.Const., art. XIII, § 1.) Among the species of property are possessory interests. " 'Possessory interests' means the following: (a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person. (b) Taxable improvements on tax-exempt land." (Rev. & Tax. Code, § 107.)

 We decide that the interest of respondents is possessory. It is more than a mere license. In arrangements of the general nature of the one before us, to which a unit of government is a party, almost inevitably there are some features of relative durability, independence, exclusiveness and fixedness, and others of relative impermanence, subjection to control and public participation. In each case, judgment must be made by examination of the agreement in its entirety. We find that a substantial balance of the factors is on the side of possessory interest. We shall discuss the salient factors.

[2]Probably he was referring to section 4404, chapter 1, division 4, title 4 of the Ordinance Code of Contra Costa County.

■ 1. *The place.* The kitchen area and the storeroom undoubtedly are in the exclusive possession of respondents.[3]

Even though this effect follows partly from sanitation laws, it is the agreement which puts respondents into possession of the restricted area. The exclusive possession by respondents of the kitchen cannot well be considered as a wholly separate matter from the somewhat less exclusive dominion of the dining area, for the two are a unit for operating purposes. In fact, the dining area is less important than in the ordinary restaurant, because patrons receive their food and beverages at a counter and take them either to the tables, to a patio, or elsewhere outside the clubhouse.

The dining area is open to the public, not only to persons who are presently customers, but also to those who simply wish to remain there at leisure. Of course, every restaurant must be open to serve all patrons who are willing to pay. Besides, it does not seem to be a disadvantage to respondents to have the place available to potential patrons drawn to it by golf and its incidents or by television. Indeed, in one case cited by respondents, *Wukaloff* v. *Malibu Lake Mountain Club, Ltd.* 96 Cal.App.2d 147 [214 P.2d 832] (not a tax case), one of the elements which brought about the decision that the venture was a mere concession was that the public could *not* be served by the permittees, but only the members of the club could be customers.

Vending machines were installed by respondents in the dining area as a matter of course, without special permission. Respondents have the duty of repairing plumbing and glass and of keeping windows clean. They placed tables and chairs in the dining area. One cannot imagine that, as a practical matter, anyone else could or would put furniture into the room.

The fact that many patrons take their food to the patio or even to the general outside does not derogate from the exclusiveness of the essential food dispensing area. The serving of food ''to go'' is a common practice of cafeterias, small restaurants and coffee shops.

We conclude, considering the nature of the enterprise, that, despite the freedom of the public to enter, the city has given to respondents an exclusiveness of possession, even against the city itself, to constitute a substantial interest.

---

[3]We are not impressed with respondents' argument that there is no description of the area upon which the agreement operates. It refers to ''the restaurant and dining room.''

■ 2. *The term.* The term of five years is relatively long and the right of first refusal, although not clearly defined, obviously is intended to facilitate renewal.

The agreement is by no means ''practically terminable at the will of the City,'' to use respondents' expression. It may be terminated only if the terms of the agreement are violated or (the second alternative probably is but one of the elements of the first) the needs of the public are not adequately met when the situation is controllable by respondents. This means rescission with the legal requirements for such action. It is true that the contract requires removal of equipment which the city manager deems unsafe and dismissal of any employee whom he deems objectionable; but these deferments to the judgment of the city's representative point up the proposition that in other respects the contract is terminable not at will but for cause only. Moreover, even if cancellation were for failure to make monthly payments, respondents would be protected by reimbursement of pro-rata cost of equipment. For a period of at least five years, no one but respondents may purvey food, beverages, confectionery or tobacco in the described area, nor may the city increase the 5 percent, no matter what the amount of patronage may be or what profit the enterprise may produce. Altogether, a marked durability permeates the contract.

■ 3. *Nonassignability.* There is a covenant against assignment or subletting without the written consent of the city council, and such a provision, respondents argue, citing *Eastman* v. *Piper,* 68 Cal.App. 554 [229 P. 1002], is characteristic of a license and not of a lease. But the *Eastman* case holds not that a covenant against assignment indicates existence of mere license, but that essentially a license, because it is personal, is incapable of being assigned by the licensee (p. 560). The provision against assignment, although it is not conclusive, is frequently characteristic of leases and is inconsistent with mere license. (*Beckett* v. *City of Paris Dry Goods Co.,* 14 Cal.2d 633, 637 [96 P.2d 122]; *County of Los Angeles* v. *Continental Corp.,* 113 Cal.App.2d 207, 228 [248 P.2d 157].)

■ 4. *The management.* The hiring and firing of employees (subject to the single prerogative of the city manager, stated above) is completely subject to respondents' action. Respondents must provide workmen's compensation insurance for them. Provision for indemnifying the city against damages is indicative of an independent operation.

Everything connected with the enterprise is under the management of respondents, subject to certain controls which might be expected to result from the fact that the city must have particular concern for the public. Thus, the restaurant must remain open whenever the golf course is in operation and for the entire day. But this is not necessarily a disadvantage to respondents, in view of the fact that there can be no competition whatever. Prices must be submitted to the city manager, but this does not mean that he has the right to fix prices. Prices must be reasonably comparable to those charged by restaurants in the city and at public golf courses in the Bay Area, but the agreement does not allow the city manager to enforce this by unilateral action. Presumably, he may counsel respondents on the subject and in event of serious violation, take steps toward rescission. Advertising is subject to approval by the city manager, a control which is compatible with the city's need to prevent offending the public, and in particular purveyors of other products than those served by respondents. The operation is much too autonomous to be regarded as a mere agency of respondents for the city.

Respondents have possession and valuable use of land and improvements sufficient to amount to a possessory interest within the meaning of Revenue and Taxation Code, section 107. We repeat, in almost the same words, the question put in *People* v. *Shearer*, 30 Cal. 645, 657, and *Kaiser Co.* v. *Reid*, 30 Cal.2d 610, 618 [184 P.2d 879] : Why should not such possession and valuable use of land subsisting in the citizen contribute its proper share, according to the value of the interest, whatever it may be, of the taxes necessary to sustain the government which recognizes and protects it?

Respondents make the point that the city attorney of Concord has given his opinion that if the tax be levied, respondents must be reimbursed and the burden will fall on the city. Whether the city made such an agreement or whether it had the power to do so, does not appear; but even if it be the fact that the city must reimburse respondents, this does not affect the legality of the tax and the duty of the assessor.

Respondents make the point that there has been a denial of equal protection of the laws. They fail, however, to do more than make a general assertion and to refer us to the reporter's transcript. We may, therefore, treat the point as waived. (3 Witkin, Cal. Procedure (1954) § 150, p. 2332.) We have, nevertheless, referred to the cited pages in the transcript and we find that in one or two cases in the county,

which were not clearly shown to be factually similar, possessory interest assessment was not made. ■ But even if other property of like character escaped taxation, such circumstance would not relieve respondents from paying a tax based on a proper assessment of their property. (*Hammond Lbr. Co.* v. *County of Los Angeles,* 104 Cal.App. 235, 247 [285 P. 896].)

The judgment is reversed with direction to the superior court to render judgment for defendants.

Rattigan, J., and Christian, J., concurred.