[Civ. No. 33117. First Dist., Div. Four. Nov. 8, 1974.]

PACIFIC GROVE-ASILOMAR OPERATING CORPORATION, Plaintiff and Respondent, v. COUNTY OF MONTEREY et al., Defendants and Appellants.

678

COUNSEL

William H. Stoffers, County Counsel, and Henry I. Jorgensen, Deputy County Counsel for Defendants and Appellants.

Ehrman & Flavin and Robert W. Tuttle for Plaintiff and Respondent.

OPINION

CALDECOTT, P. J.—Appellants, County of Monterey and City of Pacific Grove, appeal from a judgment in favor of respondent, Pacific Grove-Asilomar Corporation (Asilomar), awarding respondent a refund of taxes paid under protest.

Respondent is a nonprofit corporation organized under the laws of the State of California solely for the purpose of managing for and on behalf of the Department of Parks and Recreation, State of California, the real property and all improvements on the "Asilomar Conference Grounds." The real property and improvements are owned by the State of California.

The City of Pacific Grove (city), pursuant to an "operating agreement" with the State of California (state), managed the conference grounds from 1956 to 1969.

On June 1, 1958, the city and Asilomar entered into an agreement providing for the operation of the conference grounds by Asilomar. In managing the property Asilomar collected all rents, charges, and fees for the use of conference facilities, controlling them to the extent permitted by the agreement, depositing them in the trust accounts required by said agreement, and using them, subject to budgeting controls of the state, to pay expenses and to construct new facilities on the grounds as provided in said agreement. As required under state regulations and the agreement, Asilomar determined what groups and individuals could use its conference rooms, halls, assembly rooms, living units, lodgings, residences, and restaurant, and for what periods of time, limited by policies on accommodations as set forth in applicable agreement. State agencies were allowed free use of the facilities but paid for living expenses of individual personnel at the conference grounds. Asilomar exercised management functions, including control over the hiring and firing of employees

and buying of supplies. Asilomar initiated the preparation of price and fee schedules subject to approval by city and state. Asilomar carried out plans for new construction under a state master plan, hired architects, and submitted designs and plans for final approval by city and state. Asilomar let bids, contracted for construction, accepted the work, and paid the contractors on all new construction on the grounds. Financing of construction came entirely from revenues of Asilomar, and no borrowing had been necessary.

On November 18, 1969, the city and state cancelled their "operating agreement," the city terminating its relationship with respondent and Asilomar Conference Grounds and assigning its interest in the "concession agreement" to state.

In order to clarify and establish permanently the new relationship between respondent Asilomar and state, on November 18, 1969, they orally agreed to new terms and conditions which were then finally reduced to a formal written management agreement, entitled "Amendment No. 2 to Concession Agreement of June 1, 1958," dated November 18, 1969. According to the new management agreement, its effective date was July 1, 1970. However, for the period November 18 to July 1, respondent and state fully intended that the terms and conditions of their management agreement would nevertheless be binding upon them and govern their relationship during said period, which includes tax lien date March 1, 1970.

## I

Appellants contend that the trial court erred when it permitted respondent to present evidence and testimony not presented to the county board of equalization. The court, in appellants' view, should have confined itself to a review of the record before the board.

Appellants' legal position is as follows: (1) the proceeding before the local board of equalization was a proceeding to determine whether or not the board overvalued respondent's property; (2) the case at bar is a case involving a review of their decision as established by Code of Civil Procedure section 1094.5; (3) the cases cited by Asilomar were cases in which courts had original jurisdiction, without initial resort to the local board. Simply put, appellants assert that the trial court should have treated this case as if it were brought pursuant to section 1094.5 of the Code of Civil Procedure.

Respondent contends that the issue here is not one of valuation, but one

concerning whether a taxable possessory interest existed at all. This, they argue, is a question of law to be decided by the courts. Resort to the board of equalization is unnecessary and it is immaterial that respondent first resorted to the board.

■ Respondent's action below was an action to recover taxes erroneously and illegally collected, and not an action pursuant to section 1094.5 of the Code of Civil Procedure. An action may be brought against a county or city to recover property taxes paid by a taxpayer under protest. (Rev. & Tax. Code, § 5138.) The superior court has jurisdiction over such actions. (Rev. & Tax. Code, § 5138.)

■ If the action merely questions the propriety of the board of equalization's refusal to correct an erroneous assessment, the court cannot try de novo the question of any alleged overvaluation, but is limited to a consideration of the proceedings before the board. (*Eastern-Columbia, Inc.* v. *County of L. A.,* 70 Cal.App.2d 497, 503-504 [61 P.2d 407]; *Glidden Company* v. *County of Alameda,* 5 Cal.App.3d 371, 378-379 [85 Cal.Rptr. 88, 86 Cal.Rptr. 464].) Where the action involves a question of legality or constitutionality of the assessment and not a question of valuation, the court can try de novo the question presented to it. (Cf. *Star-Kist Foods, Inc.* v. *Quinn,* 54 Cal.2d 507 [6 Cal.Rptr. 545, 354 P.2d 1]; *County of Sacramento* v. *Assessment Appeals Bd. No. 2,* 32 Cal.App.3d 654, 661 [108 Cal.Rptr. 434].)

■ "[W]hen a board of equalization purports to decide a question of law, or refuses to hear a case on the ground that it involves only a question of law to be decided by the courts, a taxpayer has the right to resort to the courts for determination of such question." (*Flying Tiger Line, Inc.* v. *County of L. A.,* 51 Cal.2d 314, 322 [333 P.2d 323]; *A. F. Gilmore Co.* v. *County of Los Angeles,* 186 Cal.App.2d 471, 476 [9 Cal.Rptr. 67].)

■ In sum, the law can be stated as follows: the superior court is confined to a review only of the record before the board if the issue before the court is one of valuation (*Bank of America* v. *Mundo,* 37 Cal.2d 1, 4 [229 P.2d 345]). The taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact as to the taxable value of his property. (*Supra,* at p. 5.) ■ If the issue involves valuation the taxpayer may not attack the determination of a board of equalization in court unless he has presented the question to the board. (*Los Angeles etc. Corp.* v. *Los Angeles,* 22 Cal.App.2d 418, 424 [71 P.2d 282].) In cases involving only the question whether property is taxable, and where there is no question of valuation that the local board of equalization has special compe-

tence to decide, and where there is no dispute as to the facts and no possibility that action by the board might avoid the necessity of deciding the legal issue, recourse to the local board of equalization is not required. (*Star-Kist Foods, Inc.* v. *Quinn, supra,* at p. 511.)

Appellants claim that the only issue before the board concerned valuation. They reason that because respondent's legal arguments result in a zero assessment, this means respondent is questioning valuation. The main issue before the board of equalization and before the trial court was whether a taxable interest existed at all. Respondent claimed that a taxable interest did not exist because they were merely agents of the state pursuant to a contract.

In *Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157 [272 P.2d 16], the question before the courts was whether an assessment levied against the whole ownership interest instead of against a limited possessory interest was illegal. The taxpayer argued that its protest was *not* a claim of overvaluation of an owner's property calling for " 'a reduction in an assessment on the local roll,' " but rather a claim of illegality against assessments *in toto* as based on an erroneous ownership. (*Supra,* at p. 164.) The court held that the issue presented was a question of law to be decided by the court.

The issue raised by respondent herein before the board of equalization and before the trial court is no different from that raised in the *Parr-Richmond Industrial Corp.* case. Here, as there, respondent taxpayer attacks an assessment as void because it does not own the property on which the tax demand was made. Rather, respondent claims to be an agent of a tax exempt entity.

*Los Angeles etc. Corp.* v. *Los Angeles, supra,* 22 Cal.App.2d 418, cited by appellants, is not in point. Appellants rely on the following language to support their assertion that the board's determination concerned a question of valuation. "This lease is owned by appellant, it is property, and it falls within a taxable class. The assessor erroneously, under the pleading, assessed it at $500,540 when he should have assessed it at zero. In our judgment this constituted an overassessment of existing property and not an assessment of nonexistent property." (*Supra,* at p. 424.)

Appellants fail to note that the taxpayer in *Los Angeles etc. Corp.* v. *Los Angeles* claimed that the county had made an erroneous assessment because the assessor mistakenly believed that the taxpayer was paying a rent of $100 per annum instead of $557,427.67 per annum. Taxpayer was

solely concerned with valuation. Taxpayer here is not concerned with valuation.

Even if the trial court erred when it permitted respondent to present evidence not presented to the board of equalization such error is not prejudicial error. Respondent presented evidence to the trial court solely related to a question of law, i.e., the nature of relationship existing between respondent and the state. Such evidence was merely a repetition and an illustration of the agreement between the state and the respondent. The trial court could have rendered its decision without any consideration of the evidence offered before it, basing its verdict upon a question of law. (*Flying Tiger Line, Inc.* v. *County of L. A., supra,* 51 Cal.2d at p. 320.)

■ Furthermore, in light of the fact that respondent could have bypassed the board and gone directly to the court and there presented facts relevant to the question of law, the respondent should not be penalized for first exhausting its administrative remedies. (*County of Sacramento* v. *Assessment Appeals Bd. No. 2, supra,* 32 Cal.App.3d at pp. 664-665.)

## II

The central issue before this court is whether respondent has a taxable possessory interest created pursuant to contract. Respondent contends that it does not have a taxable possessory interest because it is merely an agent of the state and as an agent of the state is exempt from taxes.

Possessory interests in land or improvements are taxable pursuant to section 107 of the Revenue and Taxation Code. ■ Taxable estates include estates involving possessory interests in property which is tax exempt by virtue of ownership. (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 618 [184 P.2d 879].)

Appellants argue that (1) it is immaterial that respondent is an agent of the state; (2) respondent is not an agent of the state; (3) respondent has a possessory interest subject to tax and that it does not matter that respondent's use of the premises is neither exclusive nor profitable.

■ In spite of appellants' assertions to the contrary it is clear in California that an agent or representative "is liable for the taxes assessed him under the Code only in his representative capacity, and if the property is exempt in the hands of the principal it remains exempt in the hands of the agent." (Ehrman & Flavin, Taxing Cal. Property (1967) Assessment, § 196, pp. 173-174; *General Dynamics Corp.* v. *County of L. A.,* 51 Cal.

2d 59 [330 P.2d 794]; *County of Los Angeles* v. *Morrison*, 15 Cal.2d 368 [101 P.2d 470, 129 A.L.R. 443].)

In *General Dynamics Corp.* v. *County of L. A.,* plaintiff brought an action to recover county and city ad valorem personal property taxes. They asserted, as respondent asserts here, that they had no taxable interest in the property. Pursuant to contract, title to all of the personal property involved was in the United States. Among other grounds, the court held that pursuant to section 612 of the Revenue and Taxation Code, if property is exempt in the hands of the principal, it remains exempt in the hands of the agent. (*Supra,* at p. 65.) The court reasoned as follows: "Moreover, section 612 provides that when 'a person is assessed as agent, trustee, *bailee,* guardian, executor, or administrator, his representative designation shall be added to his name, and the assessment entered separately from his individual assessment.' (Italics added.) The assessee is liable for taxes assessed against him under this section only in his representative capacity. (*County of Los Angeles* v. *Morrison,* 15 Cal.2d 368, 371-373 [101 P.2d 470, 129 A.L.R. 443].) Accordingly, if the property held in such capacity is tax exempt, any assessment of it would necessarily be self-defeating for the tax could not be enforced against the property or its possessor personally, at least in cases such as these, where the bailee's interest in the property could not be transferred." (*General Dynamics Corp.* v. *County of L. A., supra,* 51 Cal.2d at p. 65.)

Appellants contend that the above case is distinguishable on its face because it involves personal property tax. ▪ Such a distinction is without merit. Section 612, relied on by the court for its holding applies to the assessment of taxes in general. Assessment of a tax in this case would be as self-defeating as an assessment of a tax in the *General Dynamics Corp.* case. All state-owned property is exempt from taxation. (*People* v. *Chambers,* 37 Cal.2d 552 [233 P.2d 557].)

Respondent was taxed on its possessory interest as defined by section 107 of the Revenue and Taxation Code. In discussing what a possessory interest is, Ehrman and Flavin, in Taxing California Property (1974 Supp.) section 50, pages 60-61, state the following: "Although a possessory interest may be a leasehold or such a lesser interest as an easement, there must be a right that is sufficiently exclusive, durable, and independent of the public owner to constitute more than an agency.

"For example, a concessionaire's interest under an agreement giving him the right to operate a restaurant in a club house at a municipal golf course

is a possessory interest within the meaning of Revenue and Taxation Code § 107.

"In another recent case, the court concluded that a shipping company had a taxable possessory interest under a so-called 'preferential assignment agreement' with the City of Oakland allowing the taxpayer to use City-owned marine terminals. The taxpayer's theory (and the trial court's decision, which was reversed) was that because the Port of Oakland reserved the right to use of properties possessed by Sea-Land under the agreement for the berthing of vessels and other operations 'provided . . . that such use . . . shall not unreasonably interfere with the operations' of the taxpayer, Sea-Land's possession was not so exclusive as to reach the dignity of a taxable possessory interest."

Prior to determining respondent's relationship with the state, this court must determine which management agreement controlled respondent's rights as of the lien date of March 1, 1970. This determination is crucial to the case because of the extent of the state's control in the latest concession agreement.

From 1956 through 1969, the conference grounds were managed directly by the City of Pacific Grove under an "operating agreement" with the State of California. On June 1, 1958, the city and Asilomar entered into an agreement providing for the operation of the conference grounds. On November 18, 1969, pursuant to amendment No. 3 to the operating agreement, the city assigned to the state all of its interests under the 1958 concession agreement. Asilomar and the state on November 18, 1969, orally agreed to new terms and conditions which were reduced to a formal written management agreement, entitled "Amendment No. 2 to Concession Agreement of June 1, 1958." The agreement was to become effective on July 1, 1970. However, for the period of November 18, 1969 through July 1, 1970, respondent and the state fully intended that the terms and the conditions of their new agreement be binding upon them.

Mr. Hightower, chief of the concession division for the department of Parks and Recreation, explained the discrepancy as follows: "Well, when the Operating Agreement between the State and the City of Pacific Grove was terminated, we had to have some type of paper or understanding for Asilomar to continue its operation. So we dated this piece of paper with the date in November and stated that that, as is stated here in the contract, that that was the date the Amendment was entered into. However, due to the approval process that we have in the State, as you will notice on the last approval page, it requires the approval of General Services, and al-

though it is not shown here, it goes through the Department of Finance, the Attorney General's office, and certainly it goes through all of our Departments, and we wanted an effective date that would reflect when all of these people had finally approved this piece of paper."

Appellants rely on the plain language of the concession agreement that the agreement shall be effective on July 1, 1970. Appellants also contend that even assuming that the agreement was in operation by the lien date the assessor was entitled to infer the status of the parties from the clear agreement, and not their secret intention.

When parties orally agree upon all the terms and conditions of an agreement with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is to be prepared and signed does not alter the binding validity of the oral agreement. (*Stephan* v. *Maloof*, 274 Cal.App.2d 843, 848 [79 Cal.Rptr. 461].) Witkin states the rule as follows: "Parties may engage in preliminary negotiations, oral or written, in order to reach an agreement. These negotiations ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend that a formal writing embodying these terms shall be executed later." (1 Witkin, Summary of Cal. Law (8th ed.) Contracts, § 102, pp. 103-104.)

Whether the parties intended their oral agreement to be immediately effective or only to become binding on the execution of the writing is a question of fact to be resolved by the trial court. (*McKeon* v. *Giusto,* 44 Cal.2d 152, 158 [280 P.2d 782].) The court found that on the lien date in question, March 1, 1970, "Amendment No. 2 to the Concession Agreement" controlled the rights and duties of the state and the respondent. Substantial evidence supports the trial court's findings.

Citing *Trabue Pittman Corp.* v. *County of L. A.,* 29 Cal.2d 385 [175 P.2d 512], appellants contend that an assesor is not bound to ferret out the secret intent of parties and that they can rely on the plain language of the contract which provides that it shall not become effective until July 1, 1970. *Trabue Pittman Corp.* v. *County of L. A.* does not support the proposition for which it is cited by appellant. *Trabue* involved the assessment of "trade fixtures." The court held that any agreement or secret understanding between the parties as to the classification (as real or personal property) of "trade fixtures" would not be binding on the assessor. The court stated that there must be uniformity of classification of "trade fixtures" throughout the state and that in California, for purposes of taxation, they are classified as real property. In the present case there is no question of uniformity in-

volved, only an individual contract. The interpretation of that contract, including its effective date, is a question to be determined, as in the case of any other contract, by the intent of the parties as found by the trial court.

*Kaiser Co.* v. *Reid,* 30 Cal.2d 610 at page 631 [184 P.2d 879], cited by appellants, points out a private agreement fixing the legal character of the property is not binding on the assessor. The agreement herein, however, does not fix the legal character of the property.

The court found that respondent corporation was the agent of the state and not an independent contractor. Appellants rely on the *original* concession agreement which provided that: "(b) Concessioner shall not be deemed agent of City or State and City and State shall not be obligated in any way for costs incurred for operation hereunder."

This contract was not in effect at the lien date. It was superseded by "Amendment No. 2 to Concession Agreement of June 1, 1958." Furthermore, as appellants point out, descriptive words in documents are not controlling.

Appellants contend that subsequent amendments have not altered the above-cited condition. The facts do not support appellants' contention. Paragraph 5 of "Amendment No. 2 to Concession Agreement of June 1, 1958" provides that amendment No. 3 executed on November 18, 1969, *terminated* the original operating agreement between the city and the state, and that the provisions of that concession agreement are modified to conform to the new agreement. Paragraph 6 provides that the parties (Asilomar and state) desire to amend the agreement to reflect their present relationship and their intention. This language supersedes any language defining their prior relationship. To determine Asilomar's present existing relationship with the state we turn not to the original agreement, but to the present agreement.

 The relationship that exists between the state and respondent is that of principal and agent. "In determining whether an agency relationship exists between parties to a business enterprise, which is the subject of an agreement between them, the right to control is an important factor. [Citations.] If, in practical effect, one of the parties has the right to exercise complete control over the operation by the other an agency relationship exists; the former is the principal and the latter the agent. [Citations.]" (*Nichols* v. *Arthur Murray, Inc.,* 248 Cal.App.2d 610, 613 [56 Cal.Rptr. 728].)

The management agreement between respondent and the state includes the following specific state controls:

(1) The conference grounds are managed and maintained for the use of the general public for park and recreational purposes and governed by the rules and regulations of the State Park System.

(2) The legal interest granted is a mere license. (In *Mattson* v. *County of Contra Costa,* 258 Cal.App.2d 205 [65 Cal.Rptr. 646], the court implied that a mere license is not a possessory interest under Rev. & Tax. Code, § 107.)

(3) The conference grounds are open at all times for the use and enjoyment of the general public.

(4) The premises at all times remain the property of the state and respondent cannot acquire any new property without the consent of the Director of Parks and Recreation.

(5) The contract is expressly subject to the regulations and policies of the State Park and Recreation Commission and the Director of the Department of Parks and Recreation. In event of conflict the State Park System regulations prevail.

(6) In event of public necessity the state may cancel the contract upon 30-day written notice.

(7) Respondent is organized and established *solely* to manage the conference grounds.

(8) Respondent's board of directors is appointed by the Director of the Department of Parks and Recreation subject to the concurrence of the State Parks and Recreation Commission.

(9) Fees, rates and charges established by respondent for use of the conference grounds are subject to the prior approval of the state.

(10) Fees, rates and charges are limited to the actual needs of administration, construction, repairs, safety, sanitation, etc.

(11) Commercialization for profit is forbidden.

(12) All income from the operation of the conference grounds and facilities must be deposited in a trust account approved pursuant to the Constitution and code section of the state.

(13) The operating budget is prepared in accordance with state-approved accounting procedures.

(14) The capital outlay budget must be approved by the state.

(15) Transfer of funds must be approved by the state.

(16) "Surplus funds" are under state control.

(17) Personal property may be acquired only as budgeted.

(18) Development is controlled by the state.

(19) All personal property acquired by the respondent is state property upon termination of the contract.

(20) Inventory is controlled by the state.

(21) State has right to inspect premises.

(22) Respondent must maintain fire insurance, liability insurance and other insurance in accordance with the contract.

(23) Hiring is controlled in part by the contract; the state has access to employment records.

(24) Respondent must submit an annual Financial and Operating Report to the state pursuant to state form.

(25) No changes in the articles and by-laws can be made without the consent of the state.

The testimony introduced by the respondent exemplifies the state control. For example, Asilomar was constructing a state training center on the property as directed by the state. All decisions regarding the training center were made by the state. Asilomar paid for the construction of the state center. In case of any conflicts between the state and Asilomar the state makes the final decision.

Appellants have made consistent reference to other state controlled concessions of which there are about 200. Mr. Hightower, chief of the concession division, testified that Asilomar is a *unique* operation. All the other operations are profit oriented and are operated by profit enterprise. The state with reference to these other operations does not control their income, expenditures or their budget. These other concessions pay rent. Asilomar does not pay rent.

All authority that Asilomar has is controlled by the state. Though appellants argue to the contrary, it is clear that Asilomar pursuant to the above-mentioned contract is under the absolute control of the state. It is not a state agency, but rather a legal agent of state.

Throughout their brief, appellants argued that the controls set forth in the final agreement are not "all that elaborate" and weren't in effect by the lien date. The trial court held that the controls were "that elaborate" and were in effect by the lien date. ▮ Substantial evidence supports the trial court's findings. Witnesses testified that the controls as set forth in the final agreement were in force at the time of the lien date. In fact, it appears from both the testimony and the prior agreements that most of these controls have been in effect since 1958. One such agreement provided that "[t]he Asilomar Conference Grounds is a unit of the State Park System. As such, it is a public operation."

Appellants contend in the alternative that a high degree of control does not make the controlled party an agent for tax exemption purposes. In *Alabama* v. *King & Boozer,* 314 U.S. 1 [86 L.Ed. 3, 62 S.Ct. 43, 140 A.L.R. 615], followed by the California court in *Timm Aircraft Corp.* v. *Byram,* 34 Cal.2d 632 [213 P.2d 715], the court was faced with whether Alabama could impose a sales tax on the United States government's independent contractor. The independent contractor argued that extensive controls imposed by the government made it the government's agent. The United States Supreme Court stated that no matter the control given the contractors, they did not acquire the status of agents. The court's conclusion was based on legislative and contractual intent and not on the basis of agency law. (Compare *General Dynamics Corp.* v. *County of L. A., supra,* 51 Cal.2d at pp. 69-71.)

▮ The respondent did not acquire a taxable possessory interest in the Asilomar Conference Grounds. The following cases illustrate what is meant by a taxable possessory interest and how the courts determine whether such an interest exists. Appellants cited these very same cases for their assertion that a taxable possessory interest need not be exclusive and need not be profitable, but Asilomar is a unique enterprise vastly different from the usual concessionaire.

(1) In *Kaiser Co.* v. *Reid, supra,* 30 Cal.2d 610, plaintiff possessed tax-exempt and nonexempt property in the form of two shipyards owned by the federal government. Pursuant to a "Vessel Construction Contract" with the federal government, Kaiser was building ships. Kaiser claimed that pursuant to the agreement with the federal government, it did not have a taxable possessory interest. In finding that Kaiser had a "taxable possessory interest" under this agreement, the court stressed that the tax levied on Kaiser stemmed from its use of public land and facilities which were essential to the production for a private profit. Kaiser's possessory interest

consisted of possession and valuable use of the land. (*Supra,* at pp. 618-619.) Kaiser had the right to exclusive use and possession of the property. "Under the 'Vessel Construction Contracts,' plaintiff was not given merely the right to perform services for the government, but it was required 'as independent contractor and not as agent' to construct and deliver the scheduled vessels 'at [its] own risk,' to 'make good, at its expense, any . . . defects' occurring 'within 6 months after [the commission's] acceptance of each Vessel,' to bear part of the liability for loss or destruction of any vessel during construction through 'replacement' without 'adjustment . . . in the contract price,' and to 'be responsible for any and all claims made against the Commission or the Vessels for infringement of patent or patent rights. . . .' Such contract provisions correlated plaintiff's occupancy of the shipyards with its possession of a 'usufructuary right' therein pursuant to its performance of the scheduled work under an independent profit-earning arrangement for its own benefit—a 'possessory interest arising to the dignity of taxable property' under California law." (*Supra,* at pp. 621-622.)

(2) In *Hammond L. Co.* v. *County of Los Angeles,* 104 Cal.App. 235 [285 P. 896], the taxpayer leased harbor lands owned by Los Angeles for the use of his lumber business.

(3) In *McCaslin* v. *DeCamp,* 248 Cal.App.2d 13 [56 Cal.Rptr. 42], plaintiff was employed by a tax-exempt entity. He leased living premises from this organization. The court held that he had a possessory interest because his use of the premises was exclusive to him and his family. "This exclusive use and possession was sufficient to create a possessory interest even though conditioned on McCaslin's employment, which could be terminated by the district. This is true for the test is not whether the tax-exempt agency has a right to terminate the tenancy or occupancy, or whether the taxpayer has a non-transferable interest, but whether he has the exclusive use and possession of the property against all the world, including the owner. (*Kaiser* v. *Reid, supra,* 30 Cal.2d 610.) In other words, if the employee's right to the use and possession of the employer's real property is in common with other employees, or if it is subordinate to the right of possession of the employer, the employee's right is a mere permit or license which is not taxable. But, if his use and possession are exclusive to others, including the employer, and particularly when he is paying rent therefor, it is a possessory interest under Revenue and Taxation Code section 107, and the right of the employer to terminate the employment and hence the occupancy is only a factor to be considered in fixing its value." (*Supra,* at p. 18.)

(4) *Mattson* v. *County of Contra Costa, supra,* 258 Cal.App.2d 205, is cited by Ehrman and Flavin in their text, Taxing California Property, *supra,* for the proposition that although a possessory interest may be a leasehold or such a lesser interest as an easement, there must exist a right that is sufficiently exclusive, durable, and independent of the public owner and must constitute more than an agency.

*Mattson* concerned an agreement between the City of Concord and a restaurant concessionaire who operated a snack bar at the municipal golf course. The operation was a profit-making one. The court examined in detail each term of the written agreement. It concluded as follows: "We decide that the interest of respondents is possessory. It is more than a mere license. In arrangements of the general nature of the one before us, to which a unit of government is a party, almost inevitably there are some features of relative durability, independence, exclusiveness and fixedness, and others of relative impermanence, subjection to control and public participation. In each case, judgment must be made by examination of the agreement in its entirety. We find that a substantial balance of the factors is on the side of possessory interest." (*Supra,* 258 Cal.App.2d at p. 209.)

Contrary to appellants' contention, *Mattson* wholly supports respondent's central premise that in determining whether a possessory interest is taxable, the courts weigh the factors of exclusiveness, independence, durability and private benefit on a case-by-case basis.

(5) In *Board of Supervisors* v. *Archer,* 18 Cal.App.3d 717 [96 Cal.Rptr. 379], taxpayers possessed written grazing permits issued by the federal government for cattle grazing purposes. In holding that the taxpayers had a taxable possessory interest in the land pursuant to the grazing permits, the court found that these permits created a private benefit by way of profit from the feeding and sale of cattle and further found that the taxpayer's use and possession of the property was sufficiently exclusive to give rise to taxability. (*Supra,* at p. 725.) The court specifically followed the balancing concept set forth in *Mattson.* (*Supra,* at p. 726.)

(6) *Stamps* v. *Board of Supervisors,* 233 Cal.App.2d 256 [43 Cal.Rptr. 398], heavily relied on by appellants, is a case in which the issue before the court was whether a 50-year nonprofit corporation lease of a public parking garage had been properly valued. The court held it had, noting that a leasehold is taxable, and the fact that the corporation made no profit is immaterial (*supra,* at p. 258).

*Stamps* is not on all fours with the case at bar. Here we are concerned with whether respondent actually had a taxable possessory interest. In *Stamps,* the taxpayer apparently conceded that he had a possessory interest and was solely concerned with valuation.

(7) In *Sea-Land Service, Inc.* v. *County of Alameda,* 36 Cal.App.3d 837 [112 Cal.Rptr. 113], the issue before the court was whether Sea-Land possessed a taxable possessory interest within the meaning of section 107 of Revenue and Taxation Code. The court concluded that Sea-Land possessed a taxable possessory interest *because* taxpayer had exclusive possession of the premises and had a business need to use all of the premises.

Respondent's contentions are not inconsistent with the above cases. Respondent is simply arguing that it does not have a taxable possessory interest because its interest pursuant to contract is neither exclusive, nor independent, nor beneficial and as a result it is a mere agent of the state. Furthermore, case law specifically provides that it is futile to tax an agent if the principal is not subject to tax.

The State Board of Equalization Rules are consistent with respondent's position. Section 21(a), title 18, of the California Administrative Code provides that a "possessory interest" must confer "a right of possession or exclusive use which is independent, durable, and exclusive of rights held by others in the property."

Respondent's contract with the state is distinguishable from all agreements discussed in the cases cited above. Respondent's use of the beach property is not exclusive but specifically open to the public. (Compare *Mattson* v. *County of Contra Costa, supra,* 258 Cal.App.2d at p. 210.) Respondent's use of the property is not independent but subject in every way to state control. The state controls every aspect of the Asilomar operation, from the budget plans to capital investment. Respondent's contractual rights are subject to termination on 30-day notice in the case of public need. Finally, respondent gains no private benefit from operating the premises. As pointed out, several times, the Asilomar operation is a unique operation.

Appellants further argue that even if Asilomar were an agent of the state, it would not be exempt because exceptions do not arise by implication. Appellants have confused the issue. Possessory interests in land or improvements are taxable under section 107 of the Revenue and Taxation Code. This includes estates involving possessory interests in property which itself is tax exempt. (*Kaiser Co.* v. *Reid, supra,* 30 Cal.2d at p. 618.)

Respondent does not have a possessory interest if it is an agent of the state. Respondent's interest is not taxable because it is not possessory.

### III

Appellants argue that possession by respondent was exclusive to an extent that a taxable possessory interest exists. Determination of whether or not the respondent's interest was exclusive depends *not* on an analysis of respondent and the state's original agreement, but on the new management contract dated November 18, 1969.

Appellants have consistently compared the concession agreement herein to other concession agreements, pointing out that the term of the agreement here is for 25 years; that there exists a covenant against non-assignment, etc.

But, as has been pointed out, the Asilomar concession agreement is a unique one. Most of the concession agreements we have considered are not nonprofit activities; are controlled and managed by the possessor; are let so that rental to the state or city is paid out of gross receipts, etc. (Compare *Kaiser Co.* v. *Reid, supra,* 30 Cal.2d 610; *Mattson* v. *County of Contra Costa, supra,* 258 Cal.App.2d 205; *Board of Supervisors* v. *Archer, supra,* 18 Cal.App.3d 717; *Sea-Land Service, Inc.* v. *Alameda County, supra,* 36 Cal.App.3d 837; and *Stamps* v. *Board of Supervisors, supra,* 233 Cal.App. 2d 256.)

*Stamps* v. *Board of Supervisors* is the sole concession case cited by appellants where the concessionaire was in effect a nonprofit organization, but in *Stamps,* revenues were held in trust, not for the public entity, but for the private bond-holders. In *Stamps,* there was no evidence of any control over the management of the parking facility and no claim that the corporation was merely an agent for the City of San Francisco.

In the present case, the purpose of this concession agreement was to benefit the public in general, not the Asilomar Corporation. The property herein can only be used for the public enjoyment. Complete control is in the state. Each and every activity is controlled. It is true that respondent has "all necessary authority to manage, operate, maintain and develop Asilomar and to make and enforce policies, rules and regulations related thereto . . ." *but,* "subject however, to the policies, rules and regulations of the

State of California." Furthermore, the sole reason for creating the corporation was for the purpose of this agreement. Appellants have presented no evidence to refute this. Whenever it refers to respondent's lack of control, exclusivity, etc., it refers to and cites earlier agreements.

Appellants also contend that respondent did not present evidence of state control over the Asilomar management. This issue has been discussed at great length.

Both Mr. French, president of respondent corporation, and Mr. Hightower, testified that the controls listed in the 1969 agreement were in effect both prior to the agreement and prior to the March 1 lien date.

Under a heading entitled "Assorted Irrelevancies" appellants state, citing *Rand Corp.* v. *County of Los Angeles,* 241 Cal.App.2d 585 [50 Cal.Rptr. 698], that the nonprofit status of Asilomar is immaterial. It is true that the nature of the corporation is not controlling, however, the fact that the relationship between Asilomar and the state has no profit motive is an element material in determining the nature of Asilomar's interest.

## IV

In its statement of the issues, appellants state that "Finding No. 9 is dangling and ambiguous, since it refers to a finding about plaintiff's first cause of action which doesn't exist." Appellants never discuss this. Finding No. 9 states that: "In finding as it does as to plaintiff's first cause of action, amended complaint, it is therefore not necessary for the court to make any findings as to plaintiff's second cause of action and the court makes no such findings."

The court's statement is clear. The court, having found for the plaintiff on its first cause of action involving whether a possessory interest existed, found it unnecessary to determine plaintiff's second cause of action, involving valuation.

Also, in their statement of the issues, appellants attack all the findings of fact as ambiguous because "[t]hey incorporate as true the Finding of the Board of Equalization that Asilomar did have a possessory interest and deny the same in the Court's Conclusions of Law."

That the court found as true the same facts that the board found true and

yet arrived at an opposite conclusion of law does not reflect on the finding of fact but rather on appellants' legal conclusion.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.