[Civ. No. 47398. Second Dist., Div. Four. June 24, 1976.]

STADIUM CONCESSIONS, INC., Plaintiff and Respondent, v. CITY OF LOS ANGELES et al., Defendants and Appellants.

## COUNSEL

John H. Larson, County Counsel, and Lawrence B. Launer, Deputy County Counsel, for Defendants and Appellants.

J. Robert Maddox and Patricia A. Clemens for Plaintiff and Respondent.

Ronald L. Endeman, George J. Berger and Jennings, Engstrand & Henrikson as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—Plaintiff Stadium Concessions, Inc. of California, a corporation, brought this action against the County of Los Angeles and the City of Los Angeles (pursuant to Rev. & Tax. Code, § 5138) to recover taxes paid under protest, after certain purported "possessory interests" (Rev. & Tax. Code, § 107) had been assessed by defendant County of Los Angeles. Trial was by the court, sitting without a jury. Judgment was rendered in favor of plaintiff in the amounts of $37,181.10 (principal), $4,239.55 (interest) and costs. Defendants have appealed from the judgment; we reverse, for the reasons herein stated.

Plaintiff is the exclusive concessionaire at the Los Angeles Memorial Coliseum and the Los Angeles Sports Arena, providing food and drink to the public in attendance at the events staged at these facilities, including most of the widely attended local college football games. Attached to plaintiff's complaint as Exhibit "A" is a copy of the contract under which it operates at the Coliseum, executed in 1967 by plaintiff's predecessor in interest and the Coliseum Commission (the regulatory governmental body), and renewed regularly thereafter by plaintiff and the commission at three-year intervals; it is in effect at the present time.

The contract concerning the plaintiff's operation at the Sports Arena is substantially similar to the Coliseum contract; both of these facilities are operated by the Coliseum Commission (hereinafter, the Commission); the contracts will sometimes be referred to herein as The Agreement.

At the outset we are concerned with the question of the appropriate standard of judicial review. Plaintiff contends that the applicable standard is whether the trial court's judgment and findings are supported by substantial evidence. Plaintiff aptly points out that under this standard of appellate review, the appellate court will not substitute its own judgment for that of the trial finder of fact nor reweigh the evidence. (*Carpenter Foundation* v. *Oakes* (1972) 26 Cal.App.3d 784, 790 [103 Cal.Rptr. 368]; *Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].)

In the case at bench we are dealing primarily with an interpretation of a written contract. ■ The substantial-evidence standard of judicial review applies in contract-interpretation cases only if "the interpretation turns upon the credibility of extrinsic evidence." (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) ■ If the interpretation of a contract does *not* turn upon the credibility of extrinsic evidence, the appellate court must make an independent determination of the meaning of the contract. (*Parsons, supra,* 62 Cal.2d 861, at p. 866.) *Parsons* points out that the appellate court must make an independent determination of the meaning of a contract even though conflicting inferences may be drawn from extrinsic evidence—as long as there is no conflict in the extrinsic evidence itself. (See *Parsons, supra,* 62 Cal.2d 861, at p. 866, fn. 2.)

We reject plaintiff's contention that the substantial-evidence standard of judicial review is applicable to the case at bench. We conclude that the interpretation of The Agreement involved in the instant case is not predicated upon the credibility of extrinsic evidence but, at best, upon conflicting inferences that may be drawn from nonconflicting extrinsic evidence. "Since there is no conflict in the extrinsic evidence in the present case we must make an independent determination of the meaning of the contract." (*Parsons, supra,* 62 Cal.2d 861, at p. 866.)

We set forth or summarize first the pertinent provisions of The Agreement. Pursuant to The Agreement, plaintiff has been granted "the exclusive right and privilege" by the Commission to sell food and drink

to the public, i.e., spectators at various events, in the public aisles adjacent to the seats (subject to the prior approval of the Commission) at the Coliseum, in the concourse underneath the upper seating section at the Coliseum, and on the Coliseum grounds, as well as at the Sports Arena. None of these "rights and privileges" may be granted by the Commission to others, although plaintiff may grant sub-concessions to others upon the written approval, in advance, of the Commission. In return, plaintiff pays to the Commission 33.3 percent of the gross receipts for the Coliseum concession, and a somewhat higher percentage for that at the Sports Arena.

Under the terms of The Agreement, the right of entry upon the premises in question by plaintiff is limited to a reasonable time prior to, during, and subsequent to public events where plaintiff is selling to the public. There is also a provision which states: "Nothing herein contained shall be held to limit or qualify the right of the Commission to a free and unobstructed use, occupation and control of the Coliseum [Sports Arena], and ingress and egress for itself, its licensees, and the public." Also, pursuant to The Agreement, plaintiff may be required by the Commission to "limit, suspend, or refrain partially or completely" from selling to the public during a particular event. The Commission retains the ultimate right of determining what articles plaintiff may sell, and has the power to supervise quality and price.

Reference is made in The Agreement to "certain permanent stands" owned by the Commission at the Coliseum, and available to plaintiff for concession use, as well as to temporary stands. Plaintiff has the duty to maintain both its own equipment and that belonging to the Commission but used by plaintiff. The erection of additional structures for concession operation is subject to the approval of the Commission.

The Agreement also contains detailed conditions concerning insurance, including workmen's compensation insurance, and a performance bond, all of which are to be provided by plaintiff.

Revocation is provided for upon the happening of certain events, such as unauthorized assignment or bankruptcy of the plaintiff.

The Agreement is subject to termination for "objectionable or improper" conduct on the part of the plaintiff, as defined by the Commission; default; "attachment, garnishment or execution" against

plaintiff not resolved within 10 days. The Commission has the right "following action taken at a duly constituted meeting" [of the Commission] to "re-enter and have full possession of said facilities" on the giving of three days' notice.

The present litigation commenced after the Los Angeles County Assessor, on March 1, 1972, assessed as a "possessory interest" plaintiff's use of facilities at the Coliseum and the Sports Arena, pursuant to The Agreement between plaintiff and the Coliseum Commission. A similar assessment was made in 1973 and 1974; the parties to the suit, by stipulation, subsequently amended their pleadings to expand the scope of the original litigation to include the taxes paid under protest by plaintiff in all three years, as the substantive issue involved was the same.

At the trial, the court heard oral testimony from the president of plaintiff corporation, Mr. Thomas Arthur. He stated that his company (in one corporate form or another) had operated the concession at the Coliseum since 1955, and at the Sports Arena since 1961; that the concessions were obtained by open bid; that no assessment of "possessory interests" had ever been attempted prior to 1972.

The generally followed procedure, according to Arthur, was that the Commission furnishes the shell of the concession stand, while plaintiff provides the equipment used therein, such as grills. Plaintiff occupies 20 permanent stands on the upper concourse, and 10 on the lower concourse of the Coliseum. The permanent stands are solidly constructed, with concrete foundations. There are approximately 13 other stands at the Coliseum in operation by plaintiff, and many more at the Sports Arena. Duplicate keys are held by the Commission and plaintiff to permanent stands. Arthur stated that although plaintiff maintains a "functional" office on the premises, used only when an event is in progress, its main place of business is in Century City, in the City of Los Angeles.

Arthur further testified that the amount of access to the Coliseum and the Sports Arena by plaintiff's employees was strictly limited by the Coliseum policy; that employees were permitted ingress through one particular door prior to an event; and that after an event, concession employees cleaned up the stands and removed leftover food, although some was kept in a freezer on the premises.

Plaintiff also offered the testimony of Mr. William Nicholas, the former (now retired) general manager of the Commission, who described

the operation of the Coliseum and the Sports Arena by the Commission as being on a nonprofit basis; he stated that his duties had included supervision of the concession operation; he described the operation of the concession as being under "our [the Commission] control, our responsibility."

Plaintiff's witnesses were asked to specify the occasions during the years of operation when their functioning, as provided in The Agreement, had been limited by the Commission. Only a few instances could be recalled. These included occasions (or an occasion) when the right of access by the plaintiff had been limited by the nature of the event (religious services) or by the physical requirements of the event (necessitating the closing of certain stands to make room for the staging—such as the Ice Capades).

After preparing and issuing a written notice of intended decision favoring plaintiff, the trial court signed findings of fact and conclusions of law. In pertinent part, the court found that "the Los Angeles Memorial Coliseum Commission was duly authorized by statutes made and provided in such matters to manage and control said property for the uses and benefits and purposes to which the same were created and established." Another finding was that "[a]t no time herein mentioned did the Plaintiff as against the Los Angeles Memorial Coliseum Commission have the exclusive right to possession of either of said premises [the Coliseum or the Sports Arena]. Said Commission retained and exercised its sole right to the possession of said premises together with full control of all possessory phases of the Plaintiff's operation. The possessory phases of the Plaintiff's operation were subordinate to said Commission's right to possession and Plaintiff's operation was subject in every way to the control of said Commission. Plaintiff's right to enter and to be present in order to perform servicing functions on said premises was minimal in importance and so circumscribed as to wholly lack any significate [sic] element of a taxable possessory interest in land. . . . Plaintiff's interest in said premises was primarily that of a purveyor or concessionaire operating under a license. . . . The Plaintiff's interest in said premises was not taxable because it was not possessory."

The trial court thus concluded that plaintiff had been wrongfully assessed pursuant to Revenue and Taxation Code section 107, and was entitled to recover the taxes paid under protest in 1972, 1973, and 1974.

The term, "possessory interests," is defined in Revenue and Taxation Code section 107 to mean "(a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person. [¶] (b) Taxable improvements on tax-exempt land."

Here we are concerned with the asserted possessory interest of plaintiff in tax-exempt land. California has recognized such interests since the 1850's, when gold rush miners were taxed on the millions of dollars of gold taken from the public domain in California. "Due to the fact that about half the land in California is in the public domain, the taxation of possessory interests in this state is a significant revenue item. . . ." (Ehrman & Flavin, Taxing Cal. Property (1967) § 50, p. 60.)

The same author has said that "[a] possessory interest may be a leasehold interest or the interest of either an easement holder or a *mere permittee or licensee*." (*Id.,* at p. 60.) (Italics added.) Such a possessory interest is recognized as a *species of property*. (*Kaiser Co. v. Reid* (1947) 30 Cal.2d 610, 618 [184 P.2d 879].)

Given the divergent purposes to which real property—private or public—may be applied, the case law dealing with possessory interests has dealt with situations of great variety. Thus, possessory interests have been found to exist where permittees were allowed to graze cattle on government land (*El Tejon Cattle Co. v. County of San Diego* (1966) 64 Cal.2d 428 [50 Cal.Rptr. 546, 413 P.2d 146]; *Board of Supervisors v. Archer* (1971) 18 Cal.App.3d 717 [96 Cal.Rptr. 379]); where persons were allowed to occupy residential housing, for which rent was paid, on government land (*McCaslin v. DeCamp* (1967) 248 Cal.App.2d 13 [56 Cal.Rptr. 42]; *United States of America v. County of Fresno* (1975) 50 Cal.App.3d 633 [123 Cal.Rptr. 548]); where a shipping company used publicly owned marine terminals on a rental basis (*Sea-Land Service, Inc. v. County of Alameda* (1974) 36 Cal.App.3d 837 [112 Cal.Rptr. 113]); and, where a concessionaire operated a snack bar at a publicly owned golf course (*Mattson v. County of Contra Costa* (1968) 258 Cal.App.2d 205 [65 Cal.Rptr. 646]).

Despite the variety of the possessory interests involved in the cases mentioned above, they do contain certain common approaches to the question of determining the existence of a taxable interest; some dealt with written instruments containing language describing the grant as non possessory and subject to revocation or termination at the behest of

the grantor. ■ What emerges is that a reviewing court must measure the situation by an objective standard, rather than by accepting the literal language of the written instrument as controlling the nature of the relationship established.

We deem the *Mattson* case to be particularly relevant to the case at bench, as the factual situation bears marked similarities, involving, as this case does, a concessionaire providing food and drink to customers using a publicly owned facility. *Mattson* is often cited in more recent decisions because it described the objective standard by which the presence or absence of a possessory interest held by a lessee or permittee can be determined. The court said: "The agreement refers to respondents as concessionaires, and does not use the words 'lessees' or 'tenants.' But the descriptive words used are not controlling. . . . In arrangements of the general nature of the one before us, to which a unit of government is a party, almost inevitably there are some features of *relative durability, independence, exclusiveness* and *fixedness,* and others of relative impermanence, subjection to control and public participation. In each case, judgment must be made by examination of the agreement in its entirety." (*Mattson, supra,* 258 Cal.App.2d 205, at pp. 207, 209.) (Italics added.) (See *Wells Nat. Services Corp.* v. *County of Santa Clara* (1976) 54 Cal.App.3d 579 [126 Cal.Rptr. 715], where these criteria were applied.)

In *Mattson,* an analysis of the features of the contract produced a determination that the concessionaire had a possessory, and taxable, interest. The concessionaire was operating on a five-year term basis, and had an exclusive grant. The contract included a prohibition on assignment without the prior approval of the governmental body (the city council). The court noted that "[t]he provision against assignment, although it is not conclusive, is frequently characteristic of leases and is inconsistent with mere license. [Citations.]" (*Mattson, supra,* 258 Cal.App.2d 205, at p. 211.) There were areas—a kitchen and a storage room—over which the concessionaire exercised control, although the city retained control over various internal aspects of the concessionaire's operation. The contract also provided for indemnification of the city against damages, which the court found "indicative of an independent operation."

■ Applying the standard of "relative durability, independence, exclusiveness and fixedness" to the case at bench, there is no dispute that the contractual relations of the parties are durable; they have lasted a

number of years during the renewals of the three-year term. A fixed aspect prevails; insofar as we have been told, the contractual provisions have not been amended, as they have apparently provided a workable framework for the contracting parties.

Both parties to the appeal have offered argument about the factor of "exclusiveness" of possession granted by the Commission to the plaintiff. It has been said that "[t]o give rise to a taxable possessory interest, the right of possession or occupancy must be more than a naked possession or use; it must carry with it, either by express agreement or tacit understanding of the parties, the degree of *exclusiveness* necessary to give the occupier or user something more than a right in common with others . . . ." (*United States of America* v. *County of Fresno, supra,* 50 Cal.App.3d 633, at p. 638.) (Italics in original.)

The State Board of Equalization, the administrative agency charged with the responsibility (pursuant to Gov. Code, § 15606, subd. (c)) of prescribing rules and regulations to govern assessors when they are assessing, has issued regulations interpreting Revenue and Taxation Code section 107. Pertinent for our consideration is section 21 of title 18 of the California Administrative Code which is a regulation issued by the State Board of Equalization. Section 21 defines "exclusive use" in very broad terms, using such language as "the enjoyment of a beneficial use of land or improvements, together with the ability to exclude from occupancy by means of legal process others who interfere with that enjoyment. Co-tenants may each make such use of land or improvements without impairing the other's right to use the property, as this constitutes but a single use jointly enjoyed. Exclusive use is not destroyed by one or more of the following: [¶] (1) Multiple use by persons making different uses of the same property . . . [¶] (2) Concurrent use when the extent of each party's use is limited by the other party's right to use the property at the same time, . . . [¶] (3) Alternating use . . . [¶] (4) Persons lawfully passing over or taking things from the land; [¶] (5) The existence of noninterfering easements, covenant rights, or servitudes . . . [¶] (6) Occasional trespassers."

In the *Archer* case, *supra,* the court observed that "[w]hile, of course, administrative codes and interpretations are only binding if valid and not contrary to existing law it is of some significance that [the California Administrative Code regulations on "exclusive use"] have been adopted, . . ." (*Board of Supervisors* v. *Archer, supra,* 18 Cal.App.3d 717, at p. 726.)

We conclude that The Agreement confers upon plaintiff more than a naked right; it contemplates permanent occupancy by plaintiff of public improvements, i.e., concession stands, to which both plaintiff and the Commission have access by duplicate keys, during those times when plaintiff is performing the servicing function contemplated by the parties. This appears to us to involve "concurrent use" of public property by plaintiff and the Commission. It is a right that plaintiff does not share with others, because of the exclusive nature of the concession. The fact that at infrequent intervals the need for plaintiff's services is limited does not defeat this interpretation. We cannot distinguish the *Mattson* case, as it appears to be directly applicable to the case at bench, and contains persuasive reasoning that a concession agreement may, in a particular case, produce a possessory interest in public premises by the concession-aire.

Also, The Agreement itself appears to recognize the existence of a possessory interest on the part of the plaintiff in that it contains provision for *repossession* by the Commission of the concession stands upon three days' notice.

As for independence, again it is necessary to view the total situation. The governmental body that contracted with plaintiff has the responsibility to safeguard the use of public property, and would be remiss if it did not retain *ultimate* control over such use, by grantees as well as by the public. Of necessity The Agreement recognizes this reality, but much is left to the routine control and supervision of the concessionaire. We conclude that the concessionaire has sufficient independence of operation to meet the *Mattson* requirement.

There is another factor that needs discussion relative to the concession arrangement we consider here. ■ The basic theory set forth in Revenue and Taxation Code section 107 is to protect the public domain from private-profit operation without tax liability. The presence, in a factual situation, of a profit-making operation on publicly owned premises, as opposed to a nonprofit operation, is entitled to some consideration. In *Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey* (1974) 43 Cal.App.3d 675, 694 [117 Cal.Rptr. 874], the court recognized this factor in determining the nonpossessory nature of the concession arrangement before it. It stated: "[The agreement] is a unique one. Most of the concession agreements we have considered are not *nonprofit* activities; are controlled and managed by the possessor; are let *so* that rental to the state or city is paid out of gross receipts, etc.

[Citations.]" (Italics added.) In *Pacific Grove-Asilomar,* the concession-aire operated on a *nonprofit* basis, and was found to be the agent of the state.

In *Kaiser,* the court commented upon the importance of the policy underlying section 107 taxation: "It is not the pre-emption right, but is the possession and valuable use of the land subsisting in the citizen. *Why should it not contribute its proper share, according to the value of the interest, whatever it may be of the taxes necessary to sustain the Government which recognizes and protects it?*" (*Kaiser, supra,* 30 Cal.2d 610, at p. 618.) (Italics in original.)

We therefore disagree with the determination of the trial court that plaintiff's operation at the Coliseum and the Sports Arena resulted from the granting of such "minimal" rights as to preclude liability.

The judgment appealed from is reversed, with directions to the trial court to render judgment in favor of defendants.

Files, P. J., and Kingsley, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 18, 1976.