[No. H014572. Sixth Dist. Sept. 25, 1997.]

CITY OF SAN JOSE, Plaintiff and Appellant, v.
ALFRED E. CARLSON, as County Assessor, etc., Defendant and
Respondent.

## COUNSEL

Joan R. Gallo, City Attorney, George Rios, Assistant City Attorney, Glenn D. Schwarzbach and Joseph P. DiCiuccio, Deputy City Attorneys, for Plaintiff and Appellant.

Steven M. Woodside, County Counsel, and James J. Rees, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**ELIA, Acting P. J.**—In this appeal, the City of San Jose (City) challenges a determination by the superior court that short-term users of City facilities hold a taxable "possessory interest" in the facilities when they obtain use permits upon more than one occasion. We conclude that these uses were correctly found to be taxable possessory interests within the meaning of Revenue and Taxation Code section 107. Accordingly, we will affirm the judgment.

### Background

The City owns and operates the San Jose McEnery Convention Center and Cultural Facilities (facilities). Respondent Alfred E. Carlson was the Santa Clara County Assessor at the time the action was filed. The parties jointly submitted a petition to the court outlining the facts underlying their dispute.

The convention center is used by hundreds of persons and organizations for short-term programs or events such as conventions, trade shows and parties, which last an average of one to six days. The cultural facilities include the Center for the Performing Arts and Montgomery Theaters, which hold performing arts and community events. Some occupants use the facilities one time only. Others use them two or more times per year, once a year in successive years, or a second time after an absence of multiple years. All occupants use the facilities pursuant to a written agreement with the City entitled "Facility Use Permit (Contract)."

In early 1993 the assessor for the first time levied escape property tax assessments on users who had occupied the facilities in 1990, 1991, or 1992. When the City and the occupants objected, the assessor requested an advisory opinion from the State Board of Equalization (Board) on the issue of whether such uses of the facilities were "possessory interests" subject to property taxation. Citing section 22 of title 18 of the California Code of Regulations, the Board responded that the determinative question was the "continuity of a user's right of possession or exclusive use." Thus, while first-time users were exempt, they would be subject to taxation if they received permits the following year.

After receiving the Board's response, the assessor canceled the assessments that had been levied on one-time, short-term users of the facilities. A dispute remained, however, as to the existence of a taxable possessory interest in the remaining users subjected to assessments.

The City and the assessor agreed to submit the issue to the court for determination on their stipulated facts. The assessor asserted the right to impose a possessory interest tax on those who used the facilities two or more times. The City argued that "transient" uses of the facilities lacked the requisite characteristics of a "possessory interest" within the meaning of Revenue and Taxation Code section 107 and California Code of Regulations, title 18, sections 21 and 22. The court ruled in favor of the assessor, finding that "repeated short-term uses" of the facilities constituted taxable possessory interests. The court declined to decide an additional issue raised by the City, whether taxation was proper against users who were nonprofit organizations.

### Discussion

Because the facilities at issue are owned by the City, they are not subject to real property taxes. (Cal. Const., art. XIII, § 3.) Private uses of such property may be taxed, however, if those uses constitute "possessory interests." (Cal. Const., art. XIII, § 1; Rev. & Tax. Code, §§ 104, 107, 201.) As the Supreme Court has explained, "When the city leases its land . . . it does not merely use it. It creates valuable privately-held possessory interests, and there is no reason why the owners of such interests should not pay taxes on them just as lessees of private property do through increased rents. Their use is not public, but private, and as such should carry its share of the tax burden." (*Texas Co.* v. *County of Los Angeles* (1959) 52 Cal.2d 55, 63 [338 P.2d 440].) Thus, taxation of possessory interests is rooted in the belief that "the holder of a valuable use of public property that is tax exempt should contribute taxes to the public entity which makes its possession possible and

provides a certain amount of exclusivity." (*Freeman* v. *County of Fresno* (1981) 126 Cal.App.3d 459, 463 [178 Cal.Rptr. 764]; see also *People* v. *Shearer* (1866) 30 Cal. 645, 657 [since possessory interests are "a species of property" the user should "contribute its proper share . . . of the taxes necessary to sustain the Government which recognizes and protects it"]; *Stadium Concessions, Inc.* v. *City of Los Angeles* (1976) 60 Cal.App.3d 215, 225 [131 Cal.Rptr. 442] [purpose is to protect public domain from private profit making without tax liability].)

Revenue and Taxation Code section 107 (hereafter, section 107) provides the statutory foundation for taxation of private uses of public property. Before its amendment in 1995, this statute defined "possessory interest" as "possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person."[1] The regulations promulgated by the Board further define "possessory interest" to encompass any legal or equitable interest less than a fee, if the granting instrument "confers a right of possession or exclusive use which is independent, durable, and exclusive of rights held by others in the property." (Cal. Code Regs., tit. 18, § 21, subd. (a)(1).) Some courts have also recognized a fourth criterion, that the occupant derive a "private benefit" from the use of the property. (See, e.g., *Cox Cable San Diego, Inc.* v. *County of San Diego* (1986) 185 Cal.App.3d 368, 377 [229 Cal.Rptr. 839]; *Wells Nat. Services Corp.* v. *County of Santa Clara* (1976) 54 Cal.App.3d 579, 585 [126 Cal.Rptr. 715].)

The issue presented in this case is the scope of the terms "durable," independent," and "exclusive."[2] The City contends that "sporadic, isolated, short-term" uses do not meet these criteria. More specifically, it argues, a second use should not be deemed sufficiently durable, independent, and exclusive whether it occurs in the same year or many years after the first use.

---

[1]Section 107, subdivision (a) was amended in 1995 to define "possessory interests" as the "[p]ossession of, claim to, or right to the possession of land or improvements *that is independent, durable, and exclusive of rights held by others in the property*, except when coupled with ownership of the land or improvements in the same person." (Italics added.)

[2]The current version of section 107, which incorporates the criteria of independence, durability and exclusivity, defines these terms as follows: "(1) 'Independent' means the ability to exercise authority and exert control over the management or operation of the property or improvements, separate and apart from the policies, statutes, ordinances, rules, and regulations of the public owner of the property or improvements. A possession or use is independent if the possession or operation of the property is sufficiently autonomous to constitute more than a mere agency. [¶] (2) 'Durable' means for a determinable period with a reasonable certainty that the use, possession, or claim with respect to the property or improvements will continue for that period. [¶] (3) 'Exclusive' means the enjoyment of a beneficial use of land or improvements, together with the ability to exclude from occupancy by means of legal process others who may interfere with that enjoyment."

The City further contends that some of the uses of the facilities are not for the private benefit of the user.

## 1. *Durability*

■ The element of durability is derived from a judicial requirement that the user's interest be for a "reasonably certain determinable period." (*Freeman* v. *County of Fresno, supra*, 126 Cal.App.3d at p. 463; *Kaiser Co.* v. *Reid* (1947) 30 Cal.2d 610, 618 [184 P.2d 879].) Although some courts previously regarded durability by contrasting it with "impermanence" or requiring a "fixed aspect" (see, e.g., *Mattson* v. *County of Contra Costa* (1968) 258 Cal.App.2d 205, 210 [65 Cal.Rptr. 646]; *Stadium Concessions, Inc.* v. *City of Los Angeles, supra*, 60 Cal.App.3d at p. 224), the trend has been to embrace a broader view of the "reasonably certain determinable period." Thus, revocability of a permit does not vitiate durability, nor does issuance of a permit for a brief period; in those circumstances the length of the permitted use and any "instability of rights" affect only the *value* of the interest. (*Lucas* v. *County of Monterey* (1977) 65 Cal.App.3d 947, 956 [135 Cal.Rptr. 707]; *Dressler* v. *County of Alpine* (1976) 64 Cal.App.3d 557, 564 [134 Cal.Rptr. 554]; *Scott-Free River Expeditions, Inc.* v. *County of El Dorado* (1988) 203 Cal.App.3d 896, 910 [250 Cal.Rptr. 504]; *Board of Supervisors* v. *Archer* (1971) 18 Cal.App.3d 717, 725 [96 Cal.Rptr. 379].)

The City correctly notes that the Board recognizes "continuity" as an additional consideration bearing on the establishment of durability. In section 22, subdivision (a) of the Board's regulations,[3] continuity is deemed to be satisfied when "the possessor of the property uses it to substantially the same extent as would an owner engaged in the same activity." Rule 22, subdivision (b) lists three "standards" which control the determination of taxable possessory interests based on continuity: (1) actual or constructive possession or exclusive use of the property on the lien date of the current year; (2) recurrent possession or exclusive use for any period where there is "a *history* on the lien date of *recurring use* by the present or former possessors making a similar use of the property"; and (3) infrequent actual possession or exclusive use on a recurrent basis when the continuation of the right to possession or exclusive use is conditioned on or evidenced by improvements to the property. (Italics added.)

The explanation of "continuity" in rule 22 is not helpful to our analysis. Most users do not occupy the City's facilities on the lien date (rule 22, subd. (b)(1)) because their uses are of short duration, generally less than a week.

___

[3]All further references to rules or regulations pertain to title 18, California Code of Regulations.

Likewise, there is no suggestion by the assessor that increase in value by investment "on or near the property" is a condition of the use permit or evidence of a continued right to use the premises. (Rule 22, subd. (b)(3).) According to the City, rule 22, subdivision (b)(2) also contravenes a finding of continuity because users occupying the facilities for the second time have no "history on the lien date of *recurring* use." It is unclear whether the City would regard two or more prior uses as a history of recurring use, but it urges the view that a second use is insufficient to establish continuity because a single prior occasion cannot constitute a "recurring use."

In light of section 107 and prior case law, however, we believe the City has taken an overly restrictive view of the durability element. Rule 22 is entitled to judicial deference, but only insofar as it is consistent with the governing statute and "reasonably necessary" to effectuate its purpose. (Gov. Code, § 11342.2; *B. C. Cotton, Inc.* v. *Voss* (1995) 33 Cal.App.4th 929, 951 [39 Cal.Rptr.2d 484]; *City of Berkeley* v. *City of Berkeley Rent Stabilization Bd.* (1994) 27 Cal.App.4th 951, 991 [33 Cal.Rptr.2d 317].) As the Fifth District pointed out in *Freeman* v. *County of Fresno, supra*, 126 Cal.App.3d at page 463, the three requirements of durability, independence, and exclusivity "have been applied in a less demanding way so as to find a taxable interest in most cases in which the private use of public property has been special to the person concerned and valuable." Rule 22, subdivision (b)(2) itself invites a continuity finding in a wide range of uses by contemplating a history of recurring use *either* by the possessor or *former* possessors making similar use of the property. Accordingly, as discussed earlier, the durability element read into pre-1995 section 107 (and expressly set forth in the amended version) has been liberally construed to apply to any reasonably certain determinable period. (See *Scott-Free River Expeditions, Inc.* v. *County of El Dorado, supra*, 203 Cal.App.3d at p. 903 [taxable possessory interest "may be found in virtually any situation where a private citizen is allowed to use public property for personal gain."].) Although we agree that the element of durability seems to have been "diluted to a degree of almost nonexistence" (*United Air Lines, Inc.* v. *County of San Diego* (1991) 1 Cal.App.4th 418, 442 [2 Cal.Rptr.2d 212] (dis. opn. Froehlich, J.)), the Legislature has not seen fit to reverse the growing trend toward finding taxable possessory interests in short-term uses, even in its most recent amendments to section 107.[4] If there is a sound basis for distinguishing between a second time user and a third time user of government-owned property for purposes of identifying a taxable possessory interest, it is within the province of the Legislature to clarify the parameters of that interest in terms of frequency, duration, and length of time between uses. Until then, there is no ground for insulating the second time user from taxation consistent with former section 107 as it has been judicially construed. Any

---

[4]Statutes 1995, chapter 498, section 4; Statutes 1996, chapter 171, section 2.

differences among users in amount of use should be reflected in the value of the property interests assessed.

## 2. *Independence*

■ Whether a right to use public property is independent must be determined on a case-by-case basis in light of the entire agreement between the user and the granting public entity. (*Mattson* v. *County of Contra Costa, supra,* 258 Cal.App.2d 205, 209; *Stadium Concessions, Inc.* v. *City of Los Angeles, supra,* 60 Cal.App.3d at p. 225.) In general, independence may be measured by the amount of "routine control and supervision" enjoyed by the user, with the recognition that the government necessarily retains ultimate control. (See, e.g., *Stadium Concessions, Inc.* v. *City of Los Angeles, supra,* 60 Cal.App.3d at p. 225.) If the public owner retains sufficient control, the user may be considered to be an agent, and the public entity's immunity from taxation extends to the user. (See, e.g., *Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey* (1974) 43 Cal.App.3d 675 [117 Cal.Rptr. 874].) Furthermore, "independent" uses may be identified by any profit motive of the user as distinguished from those conducted with a governmental purpose. (*Scott-Free River Expeditions, Inc.* v. *County of El Dorado, supra,* 203 Cal.App.3d at pp. 911-912; *Wells Nat. Services Corp.* v. *County of Santa Clara, supra,* 54 Cal.App.3d 579, 585.)

The independence element of a "possessory interest" analysis has received disparate treatment by the courts. In *Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey, supra,* 43 Cal.App.3d 675, 693-694, independence was found lacking because every aspect of the nonprofit corporation's use was controlled by the state and the corporation derived no private benefit from its operations. In *Freeman* v. *County of Fresno, supra,* 126 Cal.App.3d at page 465, the court minimized the significance of independence as an element separate from exclusivity. The degree of control by the public owner, the court held, merely "goes to the question of valuation, not to whether the use is or is not exclusive."

■ In this case, the facility use permit imposes certain restrictions on the use of the facilities which the City contends amount to "substantial and severe limits" on the user's control over the facilities. The challenged conditions, which are set forth in the margin below, pertain to the number and payment of personnel, access to the premises by the Director of the Convention and Cultural Facilities (the Director), use of specified caterers

and certified utility contractors, compliance with advertised prices and opening times, allowance of sufficient time for intermissions, and selection of the provider and type of concessions, programs and novelties.[5]

---

[5]The facility use permit contains the following conditions which the City contends limit the user's independence: (1) "5. SERVICES PROVIDED: . . . The City will provide one daily cleaning of all public spaces and between show cleanup as possible for events with more than one performance on a single day. . . ." (2) "6. EVENT SET[-]UP AND STAFFING NEEDS: Permittee shall file with the Director, at least ten (10) days prior to holding the event for which this permit is issued a full and detailed outline of all facilities required, all optional equipment, all stage requirements, the facility set-up, the staffing requirements and any other information that may be required by the Director concerning the event. If such information is not given, the Director will determine the needs based upon available information. Any changes supplied less than ten (10) days in advance are subject to additional fees." (3) "7. PERSONNEL SERVICES: Director shall determine the number of personnel and Permittee shall accordingly pay such personnel required for Permittee's use of the Facilities, including but not limited to stagehands, projectionists, ticket sellers, ticket takers, ushers, doorguards and security. All such personnel services supplied shall be paid by Permittee at the prevailing rates on the date of the event. Qualifications of required personnel [are] subject to approval of the Director." (4) "9. CONTROL OF FACILITIES: The Facilities, including keys thereto, shall be at all times under control of the director who shall have the right to enter the premises at all times during the period covered by his permit. The entrances and exits of said premises shall be locked and unlocked at such times as may be required for Permittee's use of the Facilities; Permittee, at his own expense, must at all times place proper watchmen at all entrances and exits when the same are unlocked." (5) "19. UTILITY CONNECTIONS: Contracts for installation of electrical, gas and plumbing shall be made by Permittee only with contractors who have been certified by the Director. . . ." (6) "21. TICKET SALES, CONTROLS AND ACCOUNTING: A properly executed Use Permit must be in effect and the prescribed rental deposit paid in full before any ticket sales may commence. Whenever Permittee's rental schedule is based on a percentage of gross ticket sales, the Director shall prescribe the form of tickets, accounts, records and reports that shall be used by the permittee in staging the event and accounting for the gross receipts. The Director may, at any and all times, investigate or inspect any or all of Permittee's tickets, accounts, records and reports as may be required for the purpose of verifying the amount of such gross receipts. The Permittee shall secure all tickets from a bonded ticket printing company meeting with the approval of the Director and shall direct that ticket company to transmit the ticket manifest directly to the Director. When utilizing the services of a computerized ticket agency, the Permittee shall direct the ticket agency to provide the Director with access codes and up-to-date ticket sales information. . . ." (7) "23. TICKET PRICES, COMPLIMENTARY TICKETS, PASSES: Permittee is required to sell tickets at the prices as advertised. Any discounted tickets require proper documentation. Complimentary tickets are limited to no more than ten percent (10%) of facility capacity. Samples of all complimentary tickets and passes and the number which may be issued must meet with the approval of the Director, and if more are issued than the number authorized by the Director, permittee shall be required to pay the applicable percentage for the unpaid admissions in excess of the approved number of passes as though the full admission charge had been collected." (8) "24. OPENING HOURS: Permittee must open the doors of his attraction as advertised unless otherwise agreed upon as necessity indicates." (9) "25. INTERMISSION: Permittee agrees that for all programs lasting 90 minutes or more, excepting religious services or other engagements specifically excluded, an intermission of not less than twenty (20) minutes shall be held, subject to modification by the Director." (10) "27. CATERING: All catering of food and/or beverage must be performed by the Facilities[-]contracted caterer." (11) "28. CONCESSION SALES: City reserves unto itself or its assigned agent the sole right: (a)

We do not agree that these conditions are so "severe" as to constitute an agency relationship with the City. Most are related to the health and safety of the personnel and the public; other conditions ensure proper accounting of ticket sales or conformance to advertised times and prices. With the exception of the reservation of the right to all concession sales, any profits from the events belong to the user, not the City. As pointed out in *Stadium Concessions, Inc.* v. *City of Los Angeles, supra,* 60 Cal.App.3d 215, 225, "The governmental body that contracted with [the user] has the responsibility to safeguard the use of public property, and would be remiss if it did not retain ultimate control over such use, by grantees as well as by the public." The agreement between the City and its permittees, like that considered in *Stadium Concessions,* accords sufficient control to the permittees to meet the criterion of independent possession.

## 3. *Exclusivity*

According to early cases discussing the exclusivity element of possessory interests, a contract had to give the user possession of the premises " ' "against all the world, including the owner." ' " (*Kaiser Co.* v. *Reid, supra,* 30 Cal.2d at p. 619, italics omitted.) ▄ Subsequently, however, this rule has been relaxed to convey a broad interpretation encompassing uses not shared by the general public. (*Wells Nat. Services Corp.* v. *County of Santa Clara, supra,* 54 Cal.App.3d at p. 584; *Freeman* v. *County of Fresno, supra,* 126 Cal.App.3d at pp. 463-464; *County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1452 [262 Cal.Rptr. 439].) Thus, it is settled that exclusivity may be found even where others are concurrently permitted to make similar use of the premises. (See, e.g., *Lucas* v. *County of Monterey, supra,* 65 Cal.App.3d 947, 956 [sharing of harbor berth in user's absence]; *Euro-Pacific* v. *County of Alameda* (1992) 11 Cal.App.4th 891, 895 [14 Cal.Rptr.2d 583] [use of maritime cargo facilities exclusive where space assigned as available]; *United Air Lines, Inc.* v. *County of San Diego, supra,* 1 Cal.App.4th 418, 427-428 [airport landing privileges]; see also *Scott-Free River Expeditions, Inc.* v. *County of El Dorado, supra,* 203 Cal.App.3d at p. 909 [exclusivity found in right to make commercial use of river, though

to sell or dispense soft drinks, candies, food items, food novelties, tobaccos, flowers, newspapers, magazines, books, periodicals, programs, librettos or any related merchandise commonly sold or dispensed at public facilities; (b) to rent and/or sell opera glasses, cushions and other articles; (c) to take and/or sell photographs; (d) to operate the parking lots and check rooms provided. The Director may, in writing, authorize a Permittee to do any of the aforesaid upon such terms as he may deem proper under the circumstances, subject to the provisions of any existing concession contracts in effect at the time." (12) "29. PROGRAMS AND NOVELTIES: These items must be sold through the Facilities contracted caterer, and must be approved in advance by the Director. From the gross sales a percentage will be withheld from settlement for payment of vendors, concessionaire, sales tax and the Facility fee. The Director shall designate stand location for merchandising such items."

private citizens may use river without limitation].) Rule 21, subdivision (e) of the regulations similarly states that exclusivity is not destroyed by concurrent use of the same property.

The exclusivity requirement does not imply continuous access to the premises, as the City suggests. What this element calls for is the right to physical possession or use of the property, "together with the ability to exclude from occupancy by means of legal process others who interfere with that enjoyment." (Rule 21, subd. (e).) The City does not claim that its tenants had no right to exclude those who interfered with their own use, or even a right of use from which others were excluded. (Cf. *Euro-Pacific* v. *County of Alameda*, *supra*, 11 Cal.App.4th 891, 897.) The exclusivity criterion, as broadly defined by the regulations and case law, was satisfied here.

### 4. *Private Benefit*

The City asked the court below to determine whether its permittees obtained a "private benefit" from their use of the facilities. The Assessor and the court regarded this issue as a matter of a tax exemption which was not properly before the court. On appeal, the City contends the court erred in declining to reach the "private benefit" issue. This is an element of a "possessory interest," not an exemption, the City argues. When the facilities are used for occasions such as holiday parties, community events, or religious meetings, the "private benefit" element is absent.

Although no published decisions have adopted the assessor's view of "private benefit" as an issue confined to specific exemptions, the concept does appear to have been accorded less recognition than other factors in the "possessory interest" analysis. The regulations do not explicitly recognize this element, though it subsequently enters into the valuation of the user's interest. The existence of a private benefit is often regarded not as a separate element but as a component of either exclusivity (see, e.g., *Scott-Free River Expeditions, Inc.* v. *County of El Dorado*, *supra*, 203 Cal.App.3d at pp. 909-910; *Lucas* v. *County of Monterey*, *supra*, 65 Cal.App.3d 947) or independence (see, e.g., *Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey*, *supra*, 43 Cal.App.3d 675). Furthermore, while some courts have preserved the distinction between commercial enterprises and public users in determining whether a "private benefit" exists (see, e.g., *United Air Lines, Inc.* v. *County of San Diego*, *supra*, 1 Cal.App.4th at pp. 428-429), other courts have described this element as an "economic benefit" regardless of any profitmaking endeavors. (See, e.g., *Cox Cable San Diego, Inc.* v. *County of San Diego*, *supra*, 185 Cal.App.3d at p. 381.) For example, housing on a government employer's property has qualified as a taxable possessory interest, even where such residence is a condition of employment. (See *McCaslin*

v. *DeCamp* (1967) 248 Cal.App.2d 13, 17-18 [56 Cal.Rptr. 42]; *United States of America* v. *County of Fresno* (1975) 50 Cal.App.3d 633, 638 [123 Cal.Rptr. 548]; *U.S.* v. *County of San Diego* (9th Cir. 1992) 965 F.2d 691, 698.) Some courts have recognized *any* "valuable private benefit" whether or not income is generated from the use. (See *Freeman* v. *County of Fresno, supra*, 126 Cal.App.3d at p. 464; cf. *Lucas* v. *County of Monterey, supra*, 65 Cal.App.3d at p. 956 [use of assigned public harbor berth is valuable possessory interest].) And at least one court has refused to excuse an organization from a possessory interest tax based solely on its nonprofit status. (*Rand Corp.* v. *County of Los Angeles* (1966) 241 Cal.App.2d 585, 590 [50 Cal.Rptr. 698].)

We decline to adopt the assessor's suggestion that a user always obtains a valuable private benefit whenever the use is not shared by the general public. Nevertheless, the existence of this factor must be determined on a case-by-case basis. ▮ Here, whether nonprofit status is viewed as relevant to a "private benefit" element of a possessory interest or solely as a basis for exemption, the facts bearing upon the taxability of each of the challenged uses were not before the court. The court therefore correctly refused to reach this issue.

*Disposition*

The judgment is affirmed.

Wunderlich, J., and Mihara, J., concurred.