[No. A122975. First Dist., Div. Five. Feb. 8, 2010.]

VANGUARD CAR RENTAL USA, INC., Plaintiff and Appellant, v. COUNTY OF SAN MATEO, Defendant and Respondent.

COUNSEL

Van Loon & Associates and Paul L. Van Loon for Plaintiff and Appellant.

Michael P. Murphy, County Counsel, and Lee A. Thompson, Deputy County Counsel, for Defendant and Respondent.

OPINION

**BRUINIERS, J.**—The County of San Mateo (County) assessed ad valorem property taxes on certain areas leased in common by Vanguard Car Rental USA, Inc. (Vanguard),[1] within a rental car facility at San Francisco

---

[1] Vanguard does business as both National Car Rental and Alamo Rent A Car and is the successor in interest to all rights and obligations of National Car Rental System, Inc. (National), and Alamo Rent A Car, Inc. (Alamo).

International Airport (SFO). Vanguard protested the assessments, first to the County and then in the superior court, and sought a refund of taxes paid. The County denied the protest. The superior court, on a stipulated evidentiary record, concluded that Vanguard had a taxable possessory interest in the subject areas and entered judgment for the County. Vanguard appeals, broadly contending that a commercial tenant on public property cannot, as a matter of law, have a taxable possessory interest in defined common areas. We disagree and will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

SFO is located in San Mateo County, but owned by the City and County of San Francisco (City). In 1998, Alamo, by written agreement with City (Alamo Lease), leased space at SFO's rental car facility (RCF). At the same time, National entered into a nearly identical written lease agreement (National Lease). The two lease agreements reflect that six other rental car companies were also to lease space at the RCF. The RCF "is comprised of a five-story garage and associated quick turn around facilities ('QTA'), vehicle staging and storage space, all as described in Exhibit A . . . , and satellite buildings now or hereafter constructed."

The leased "Premises," under both the Alamo Lease and the National Lease, consist of three categories of space within the RCF: "Exclusive Space," "Common Use Space," and "Limited Common Use Space." Exclusive Space is described as "space leased by Tenant for its exclusive use."[2] Exclusive Space includes office space and "ready car" space. Common Use Space (CU Space) is described as "space used in common with all tenants of the [RCF]."[3] The CU Space includes the ramps that connect each

---

[2] Exclusive Space under the Alamo Lease is further described as: "(1) 141,798 square feet of garage space on Level(s) 1, 4 of the [RCF], of which 4,383 square feet shall be for administrative purposes . . . , and 888 square feet shall be for customer service counter space . . . as described on Exhibit A. [¶] (2) 18,054 square feet of Quick Turn Around ('QTA') space. [¶] (3) 35,058 square feet of garage space on Level 5. [¶] (4) 42,845 square feet of surface space." Exclusive Space under the National Lease is defined as: "(1) 103,207 square feet of garage space on Level(s) 1, 2, 3, 4 of the [RCF], of which 4,341 square feet shall be for administrative purposes . . . , and 764 square feet shall be for customer service counter space . . . as described on Exhibit A. [¶] (2) 12,036 square feet of Quick Turn Around ('QTA') space. [¶] (3) 30,397 square feet of garage space on Level 5. [¶] (4) 28,814 square feet of surface space."

[3] CU Space under the Alamo Lease is defined as: "(1) 16,850 square feet of garage space on Level(s) 1–5 of the [RCF]. [¶] (2) 302 square feet of QTA space. [¶] (3) 10,384 square feet of garage space on Level 5. [¶] (4) 20,979 square feet of surface space." The National Lease

of the floors of the RCF. Limited Common Use Space (LCU Space) is defined as "space used in common with a limited number of companies leasing a specific area ('Shared Area'),"[4] and includes those areas on each floor of the RCF that are shared with the other tenants on the same floor. All of the CU Space and LCU Space are within the RCF.

The leases provide that Alamo and National are each "solely responsible for payment of rent on Exclusive Space." Rents for the CU Space and LCU Space, however, are based pro rata on the proportion of the total Exclusive Space that each rents in the RCF. The leases also provide that each tenant would concurrently enter into a concession agreement with City as well as a participation agreement with other tenants of the RCF "for the development of all common tenant improvements."[5]

In addition to Exclusive Space, CU Space, and LCU Space, the leases also describe "Public Areas," for which no rent is paid. These Public Areas are "limited to the public lobbies, public bathrooms, public elevators and escalators, stairwells, emergency tunnel, and the Police substation in the Garage. No Public Areas exist in the QTA."

In tax years 2003, 2004, and 2005, the County assessed property taxes (on an income basis) on all leased property under the National Lease, including CU Space and LCU Space. In tax years 2004 and 2005, the County assessed property taxes on all property leased under the Alamo Lease, including CU Space and LCU Space. Both National and Alamo filed applications for changed assessment with the County Assessment Appeals Board (Board). The applications were also designated as claims for refund. After an evidentiary hearing, the Board concluded that the Alamo and National leases created taxable possessory interests in the CU Space and LCU Space and denied the applications.

Vanguard then filed a complaint in the superior court seeking refund of property taxes (in the sum of $74,395.93, plus interest) on the basis that it did not have taxable possessory interests in anything other than its Exclusive

---

further describes its CU Space as: "(1) 12,275 square feet of garage space on Level(s) 1–4 of the [RCF]. [¶] (2) 220 square feet of QTA space. [¶] (3) 7,564 square feet of garage space on Level 5. [¶] (4) 15,283 square feet of surface space."

[4] The LCU Space in the Alamo Lease is: "(1) 33,169 square feet of garage space on Level 4 of the [RCF]. [¶] (2) 0 square feet of QTA space. [¶] (3) 0 square feet of garage space on Level 5. [¶] (4) 0 square feet of surface space." In the National Lease it is defined as: "(1) 21,774 square feet of garage space on Level(s) 2, 3, 4 of the [RCF]. [¶] (2) 0 square feet of QTA space. [¶] (3) 0 square feet of garage space on Level 5. [¶] (4) 0 square feet of surface space."

[5] These agreements are not at issue on appeal.

Space, as defined in each lease.[6] The parties stipulated that the Board's administrative record, including the Board's written findings of fact and decision, would be the only evidence considered by the trial court. The trial court's decision, after a bench trial, provides: "The court finds that [Vanguard] had possession or a right of possession in the property at issue. The court also finds that [Vanguard's] possession satisfied the statutory and regulatory requirements of independence. The court also finds that [Vanguard] has not met its burden of proving that its possession of the property in question was not exclusive." The court entered judgment against Vanguard. Vanguard filed a timely notice of appeal.

## II. DISCUSSION

The County has the right to assess taxes on nonexempt property within its jurisdiction. (Cal. Const., art. XIII, § 1; see also Rev. & Tax. Code, § 201 [all property within the state is subject to taxation if not exempt under federal law or other state law].) The basic legal principles applicable when otherwise tax-exempt public property is subject to a private use were stated in *City of San Jose v. Carlson* (1997) 57 Cal.App.4th 1348, 1352–1353 [67 Cal.Rptr.2d 719]: "Because the facilities at issue are owned by the City, they are not subject to real property taxes. (Cal. Const., art. XIII, § 3.) Private uses of such property may be taxed, however, if those uses constitute 'possessory interests.' (Cal. Const., art. XIII, § 1; Rev. & Tax. Code, §§ 104, [subd. (a),] 107, 201.)[7] As the Supreme Court has explained, 'When the city leases its land . . . it does not merely use it. It creates valuable privately-held possessory interests, and there is no reason why the owners of such interests should not pay taxes on them just as lessees of private property do through increased rents. Their use is not public, but private, and as such should carry its share of the tax burden.' (*Texas Co.* v. *County of Los Angeles* (1959) 52 Cal.2d 55, 63 [338 P.2d 440].) Thus, taxation of possessory interests is rooted in the belief that 'the holder of a valuable use of public property that is tax exempt should contribute taxes to the public entity which makes its possession possible and provides a certain amount of exclusivity.' [Citations.]" (Ellipses in *City of San Jose v. Carlson.*)

---

[6] Vanguard also sought declaratory relief determining that the leases did not create taxable possessory interests in the common spaces under applicable law, and that the assessment method used by the County was unsound and resulted in an improper and arbitrary valuation of Vanguard's possessory interests.

[7] All further statutory references are to the Revenue and Taxation Code, unless otherwise specified.

Vanguard does not challenge taxation of its possessory interest in its Exclusive Space as identified in the two leases, but contends that no taxable possessory interests under section 107[8] were created in the CU Space or the LCU Space by the Alamo Lease and the National Lease. More than this, it makes the broader assertion that, almost definitionally, such areas used in common with others cannot as a matter of law meet the statutory "possessory" requirements to permit taxation. We find no support in either the statutory framework or in the decisional authority for such a sweeping proposition.

"When enacted in 1939, section 107, subdivision (a), was brief and defined a 'possessory interest' as the '[p]ossession of, claim to, or right to the possession of land or improvements, except when resulting from ownership of the land or improvements.' [Citation.] In *Kaiser Co. v. Reid* (1947) 30 Cal.2d 610 [184 P.2d 879], the Supreme Court first set forth three essential elements for determining if a taxable possessory interest exists. [Citation.] 'The agreement [between the possessor and the public owner] had to confer use and possession (1) for a reasonably certain determinable period, (2) which was exclusive against all the world, including the rightful owner, and (3) which generated a valuable private benefit.' [Citation.] [¶] Over time, the requirements were applied in a 'less demanding way so as to find a taxable interest in most cases in which the private use of public property [had] been special to the person concerned and valuable.' [Citation.] In

_____

[8] Section 107 currently provides, in pertinent part: " 'Possessory interests' means the following: [¶] (a) Possession of, claim to, or right to the possession of land or improvements that is independent, durable, and exclusive of rights held by others in the property, except when coupled with ownership of the land or improvements in the same person. For the purposes of this subdivision: [¶] (1) 'Independent' means the ability to exercise authority and exert control over the management or operation of the property or improvements, separate and apart from the policies, statutes, ordinances, rules, and regulations of the public owner of the property or improvements. A possession or use is independent if the possession or operation of the property is sufficiently autonomous to constitute more than a mere agency. [¶] (2) 'Durable' means for a determinable period with a reasonable certainty that the use, possession, or claim with respect to the property or improvements will continue for that period. [¶] (3) 'Exclusive' means the enjoyment of a beneficial use of land or improvements, together with the ability to exclude from occupancy by means of legal process others who may interfere with that enjoyment. For purposes of this paragraph, 'exclusive use' includes the following types of use in property: [¶] (A) Sole occupancy or use of property or improvements. [¶] (B) Use as a cotenant. [¶] (C) Concurrent use by a person who has a primary or prevailing right to use property or improvements at any time. [¶] (D) Concurrent uses by persons making qualitatively different uses of property or improvements. [¶] (E) Concurrent use by persons engaged in similar uses that diminish the quantity or quality of the property or improvements. [¶] (F) Concurrent use that does not diminish the quantity or quality of the property or improvements, if the number of those concurrent use grants is restricted. [¶] A use of property or improvements that does not contain one of the elements in subparagraphs (A) to (F), inclusive, shall be rebuttably presumed to be a nonexclusive use. [¶] (b) Taxable improvements on tax-exempt land. . . ."

response to case law and the perceived protax trend, the Legislature in 1995 passed an amendment to specify the elements necessary to define a possessory interest as taxable, as set forth in section 107. [Citations.]" (*Korean Air Lines Co., Ltd. v. County of Los Angeles* (2008) 162 Cal.App.4th 552, 559–560 [76 Cal.Rptr.3d 26] (*Korean Air Lines*).)

Section 107, subdivision (a), now defines "possessory interests" as "Possession of, claim to, or right to the possession of land or improvements that is independent, durable, and exclusive of rights held by others in the property, except when coupled with ownership of the land or improvements in the same person." (Accord, Cal. Code Regs., tit. 18, § 20, subd. (a).) Vanguard concedes that its interests in the CU Space and the LCU Space satisfy section 107's "durability" requirement.[9] Vanguard contends, however, that the rights granted by the leases do not give either Alamo or National actual "possession" of the spaces in issue, nor is their use "exclusive" or "independent."

A. *Standard of Review*

The parties disagree about the appropriate standard of review. Vanguard asserts that its appeal presents a question of law that is reviewable de novo. The County, on the other hand, contends that "[t]his appeal involves the resolution of factual issues," and that the proper standard of review is substantial evidence. While we disagree with Vanguard's reasoning, Vanguard is nonetheless correct on this point.

Contrary to Vanguard's position in its briefing, the question on appeal is not whether an appropriate valuation method was used. Thus, *Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232 [19 Cal.Rptr.2d 165], cited by Vanguard, which addressed whether an assessor erred by including enterprise value in a valuation of a public stadium food and beverage concession, is not on point. (*Id.* at pp. 1234, 1240.)

Instead, we are asked whether, on essentially undisputed facts, taxable possessory interests are created in the CU Space and LCU Space by the leases. None of the cases cited by the County, in support of its argument for substantial evidence review, involve this question.

---

[9] Section 107, subdivision (a)(2), provides the following definition: " 'Durable' means for a determinable period with a reasonable certainty that the use, possession, or claim with respect to the property or improvements will continue for that period." Here the Alamo Lease and National Lease each provide for a term of five years.

The issue before us is one of law, reviewable de novo. (*Air China Limited v. County of San Mateo* (2009) 174 Cal.App.4th 14, 18 [93 Cal.Rptr.3d 893] (*Air China*); *Korean Air Lines, supra,* 162 Cal.App.4th at p. 558; see also *Pacific Grove-Asilomar Operating Corp. v. County of Monterey* (1974) 43 Cal.App.3d 675, 680–683 [117 Cal.Rptr. 874] (*Pacific Grove-Asilomar*) [whether taxpayer has any possessory interest at all is question of law and not valuation issue].)

## B. *Section 107's "Possession" Requirement*

Vanguard first argues that it does not meet the threshold requirement for taxation in that it did not literally "possess" or have a "right to" possess the CU Space and LCU Space. Section 107's implementing regulation provides the following definitions: "(2) 'Possession' of real property means actual physical occupation. 'Possession' requires more than incidental benefit from the public property, but requires actual physical occupation of the property pursuant to rights not granted to the general public; thus, the use of property such as hallways, common areas, and access roads at airports, stadiums, convention centers, or other public facilities by customers or employees of those who may lease *other* public property at the public facility of which they have exclusive use does not constitute 'possession' of those hallways, common areas, or access roads by the lessee of the public property. [¶] (3) A 'right,' or a 'claim to a right,' to the possession of real property means the right, or claim to a right, to actual physical occupation of real property. For purposes of this subdivision, a right, or a claim to a right, to the possession of real property may exist as a result of the possessor having or claiming to have: (i) *a leasehold estate,* an easement, a profit a prendre, or any other legal or equitable interest in real property of less than fee simple or life estate, regardless of how the interest may be identified in a deed, lease, or other document; or (ii) a use permit or agreement, such as a federal grazing permit, a permit to use a berth at a harbor, or a county use permit authorizing professional rafting outfitters to commercially operate on a river, that creates a legal or equitable interest in real property of less than fee simple or life estate." (Cal. Code Regs., tit. 18, § 20, subd. (c)(2)–(3), italics added.)

■ The examples of nonpossessory interests given in California Code of Regulations, title 18, section 20, subdivision (c)(2) above ("use of property such as hallways, common areas, and access roads at airports, stadiums, convention centers, or other public facilities") make clear that a tenant does not "possess" public areas within or ancillary to a facility simply by virtue of

leasing *other* public property at the same facility. However, a leasehold estate is expressly recognized by the regulation as a form of possessory interest and here the defined "Premises" under the leases are not areas of a sort typically used by the public in common, but three geographically defined categories of space for which Alamo and National agreed to pay rent in exchange for the right to use those spaces in a manner that the general public could not. The Board found: "Pursuant to their respective Lease Agreements, [National and Alamo] paid rent to the City in exchange for the right to beneficially use all of the leased space (defined as the 'Premises' and which included certain CU/LCU Areas) in connection with their rental car business operations. . . . [¶] Moreover, [National's and Alamo's] rights to use the CU/LCU Areas clearly differed from the rights held by members of the general public with respect to such space. Members of the general public, for example, were not entitled to utilize [National's or Alamo's] QTA or common use garage space for their own private purposes and could have been prevented by [National and Alamo] from doing so. . . ." The trial court likewise found that the lessees' right to occupy and use the common areas constituted possession or a right to possession under section 107 and California Code of Regulations, title 18, section 20.

Vanguard's reliance on *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102 [16 Cal.Rptr.2d 479] (*County of Los Angeles*) is misplaced. In *County of Los Angeles*, the court considered whether possessory interests were created by concession agreements between several car rental companies and Long Beach Airport, as well as " 'leases and concession agreements' " with the Burbank airport. (*County of Los Angeles, supra*, 13 Cal.App.4th at pp. 105, 110.) The agreements granted "both the right to conduct a car rental business at the particular airport and the right to occupy and use certain limited portions of it, namely designated counters or booths, and . . . spaces in a 'ready/return' parking lot. The Burbank agreements also grant a nonexclusive right to use common areas to be designated, as well as terminal public areas such as restrooms and waiting areas; the Long Beach agreements authorize joint use of walkways surrounding the rental booths, as well as 'the use . . . on [*sic*] the Airport' to conduct the car rental concession. In exchange for these rights, the rent-a-cars have agreed to pay the airport authorities, subject to guaranteed minimums, 10 percent of gross receipts from all car rentals delivered in the airports' areas, whether or not arranged through the booths. *Burbank separately charges specified 'rent' for the booths and lot spaces.*" (*Id.* at pp. 105–106, error notation in *County of Los Angeles*, final italics added.)

The court in *County of Los Angeles* concluded that the rental car companies' possessory interests were limited to the counter space and designated parking lot areas and that the companies could not be taxed on use of the facilities of the airport as a whole. (*County of Los Angeles, supra*, 13 Cal.App.4th at pp. 111–112.) The court reasoned: "[J]ust as possessory interests are a species of taxable property, the possession or use which grounds them means and *requires not just some benefit from the public property, but physical possession or use of it.* [¶] . . . Under the agreements and evidence concerning Burbank and Long Beach, . . . there is no dispute that the rent-a-cars enjoy possession and exclusive use of their counters (booths) and ready/return spaces. But that is the full extent of the rent-a-cars' rights of possession or use of airport property, except in common with, and coequal to, everyone else. . . . [¶] . . . [¶] . . . [T]he mere fact that the rent-a-cars derive customers and revenues through the gates of an airport terminus or 'system' does not define the existence and extent of their possessory interest in the airport property. The County's colloquial concept of airport 'use' does not account for possession or occupancy, and thus misconceives the elements and requisites of a possessory interest." (*Ibid.*, fn. omitted, italics added.) Thus, the court concluded that "[t]he further rights granted by the agreements, to do business at the airports and their environs, are not possessory interests. They are intangibles, not subject to property (possessory interest) tax. [Citation.]" (*Id.* at p. 112.)

Intangible rights or general access rights to public areas granted under concession agreements are not the basis for taxation in the case before us. In this case, Vanguard leased three defined categories of space within a dedicated rental car facility, not simply counter space within an airport terminal. Further, contrary to Vanguard's assertion, it was not taxed as if it had a possessory interest in the "whole" RCF. In addition to Exclusive Space, CU Space, and LCU Space, the leases also define Public Areas, for which no rent is paid. These Public Areas are "limited to the public lobbies, public bathrooms, public elevators and escalators, stairwells, emergency tunnel, and the Police substation in the Garage." It is these Public Areas, which Alamo and National share "in common with, and coequal to, everyone else" that are analogous to the contested airport facilities in *County of Los Angeles*. (*County of Los Angeles, supra*, 13 Cal.App.4th at pp. 105–106, 111.) Vanguard does not contend that it was taxed on its use of such public areas.

We agree with the Board and the trial court that, pursuant to the Alamo and National Leases, Vanguard had the right to actual physical occupation of the CU/LCU Spaces pursuant to rights not granted to the general public, and

therefore "possessed" or had a "right to possess" the CU Space and LCU Space. We thus turn to the further requirements under section 107 that a tenant's interest be "independent" and "exclusive of rights held by others in the property."

## C. *The "Independence" Requirement*

Pursuant to section 107, subdivision (a)(1), " 'Independent' means the ability to exercise authority and exert control over the management or operation of the property or improvements, separate and apart from the policies, statutes, ordinances, rules, and regulations of the public owner of the property or improvements. A possession or use is independent if the possession or operation of the property is sufficiently autonomous to constitute more than a mere agency." (Accord, Cal. Code Regs., tit. 18, § 20, subd. (c)(5).)

■ Vanguard contends that the "independence" requirement cannot be satisfied because "neither individually nor collectively do any of the tenants have the right to control any portion" of the CU Space or LCU Space. The evidence is to the contrary. Section 1.5 of the lease agreements does not indicate that City, as lessor, retained any greater control over the CU Space or LCU Space than that which it retained over Exclusive Space.[10] The Board noted that "Section 2.4 of [the lease] references the fact that certain 'common tenant improvement work' was in progress, thereby indicating that lessees such as [National and Alamo] had the ability to erect certain improvements on common use space." Likewise, the leases provide that each tenant is jointly responsible with all other tenants of the RCF "for the maintenance and repair of the improvements, equipment and facilities used in common with other tenants of the [RCF], described as [CU] Space or [LCU] Space . . . ." That City, as the owner, retained ultimate control over the entire RCF is of no consequence. "A lessee of publicly owned property . . . need not have absolute control over a space for its rights to use the space to constitute an 'independent' use. Courts have long recognized that the public owner 'necessarily retains ultimate control.' [Citation.]" (*Korean Air Lines, supra,* 162 Cal.App.4th at p. 563.)

---

[10] Section 1.5 of the lease agreements provides: "Tenant acknowledges and agrees that (a) City shall have the right at all times to change, alter, expand, and contract *the Airport, including the* [*RCF*]; (b) City has made no representations, warranties, or covenants to Tenant regarding the design, construction, pedestrian traffic, or views of the Airport or the Premises. Without limiting the generality of the foregoing, Tenant acknowledges and agrees that the Airport (i) is currently undergoing, and may from time to time hereafter undergo, renovation, construction, and other Airport modifications; and (ii) may from time to time adopt rules and regulations relating to security and other operational concerns that may affect Tenant's business. Although City will use reasonable efforts to minimize the effect of the Master Plan Expansion and other activities on Tenant's business, Tenant acknowledges that such activity may have some effect on rental car operations located at the Airport." (Italics added.)

In *Korean Air Lines*, an airline leased terminal space at Los Angeles International Airport consisting of three categories: (1) exclusive space for ticket counters and offices; (2) joint-use space that included the departure lounge, baggage service, baggage claim, and other areas used by other airlines; and (3) the federal inspection service area (FIS area) that included customs, federal inspection service offices, baggage services, customs baggage claims, cashiers, interline baggage, immigration inspection, storage, lockers, a transit lounge, conference rooms, and other areas. (*Korean Air Lines, supra*, 162 Cal.App.4th at p. 555.) The airline conceded a possessory interest with respect to the exclusive space and joint-use space, but argued that its use of the FIS area was not sufficiently independent to constitute a taxable possessory interest. (*Id.* at pp. 555–556, 561.)

■ In interpreting the definition of "independent" in section 107, the court in *Korean Air Lines* concluded that "the first sentence describes the type of autonomy required: 'the ability to exercise authority and exert control over the management or operation of the [area in question], separate and apart from' the constraints imposed by legal and policy requirements of the public owner. (§ 107, subd. (a)(1).)" (*Korean Air Lines, supra*, 162 Cal.App.4th at p. 562, brackets in *Korean Air Lines*.) The second sentence of section 107, subdivision (a)(1), "delineates the degree of such autonomy required for independence: '[a] possession or use is independent if the possession or operation of the property is sufficiently autonomous to constitute more than a mere agency.' [Citation.]" (*Korean Air Lines, supra*, 162 Cal.App.4th at p. 562.)

Looking to the terms of the lease, the court noted that " 'independence' is determined 'on a case-by-case basis in light of the entire agreement between the user and the granting public entity.' [Citation.]" (*Korean Air Lines, supra*, 162 Cal.App.4th at p. 562.) Rejecting the argument that independence was defeated by extensive federal regulation of the area, the court found that "[n]o provision of the lease and [no federal law or regulation] support a finding that when [the airline] used the FIS area for deplaning its passengers and crew, [the airline] was acting on behalf of, and hence, as the agent of, the federal government or the City. [Citation.]" (*Id.* at pp. 562–563.)

The court also observed that "use of a space for a profit-making enterprise or other private benefit is an integral factor in establishing 'independence,' and, that [the airline's] use of the FIS area is for the purpose of commercial profit, not for governmental purposes. [Citation.]" (*Korean Air Lines, supra*, 162 Cal.App.4th at p. 563.) "The fact that [the airline] had 'more than a mere right shared with the general public' [citation] gave plaintiff a measure of

control over use of the FIS area not shared with the general public. That is, [the airline] had 'a special right of access for profit which was not shared in common by all who entered the airport terminal.' [Citation.]" (*Id.* at p. 565.) The "independence" of the airline's use of the FIS area was further evidenced by the fact that the FIS area functioned, along with the other leased spaces, as "a unit with respect to [the airline's] commercial enterprise at LAX by providing a defined location for [it] to serve departing and arriving passengers, their baggage and other needs and desires related to their travel via [its] aircraft." (*Ibid.*) The airline, therefore, was not a mere public agent, and it retained sufficient authority over the FIS area to satisfy the "independence" requirement. (*Id.* at p. 568.)

Vanguard's attempt to distinguish *Korean Air Lines* is unpersuasive. Vanguard observes that Korean Air Lines required use of the FIS area to complete its commercial transaction with its customers. (*Korean Air Lines, supra*, 162 Cal.App.4th at pp. 565–566.) But Vanguard provides no support in the record for its assertion that "[National and Alamo] are able to operate their business with or without the Common Use Area and Limited Common Use Area." Vanguard elsewhere concedes that the CU Space includes ramps connecting each of the floors of the RCF and that the CU Space and LCU Space "are for rental car overflow." Vanguard does not explain how it could have conducted its rental car businesses, given the location of its Exclusive Space on upper level floors within a multilevel facility, if its cars could not be moved via these ramps or if it could not store excess vehicles onsite. Rather, it appears that all three elements of the leased "Premises" operated as a unit in operation of Vanguard's rental car business. The record does not indicate that Vanguard's ability to utilize the CU Space and LCU Space was any less independent of City control than its use of its Exclusive Space. (See *Korean Air Lines, supra*, 162 Cal.App.4th at p. 565.)

Unlike the FIS areas in dispute in *Korean Air Lines* (and where a taxable independent possessory interest was found), nothing in the record here suggests that the CU Space and LCU Space were heavily regulated by governmental authorities, or that they served any governmental purpose. Nor did the lease terms, or any other conditions reflected in the record, restrict National's or Alamo's use of the CU Space and LCU Space such that it would essentially function as City's agent. (Cf. *Pacific Grove-Asilomar, supra*, 43 Cal.App.3d at pp. 693–694 [no possessory interest existed when public owner exercised absolute control over conference grounds and nonprofit management corporation derived no private benefit].) Vanguard leased the CU Space and the LCU Space in furtherance of its own economic interests.

Vanguard argues that the court's interpretation of section 107 in *Korean Air Lines*, which Vanguard contends unduly focuses on the element of economic benefit derived by a tenant, would "swallow" the statutory requirements, and would treat any private lessee of public property as having a de facto fee simple interest in the whole simply by doing business on the property. First, *Korean Air Lines* held no such thing. Second, as discussed above, *County of Los Angeles, supra*, 13 Cal.App.4th at pages 111–112, addressed the necessary threshold element of "possession" of the property. In any event, it is precisely the purpose of possessory interest taxation to separate private entrepreneurial uses of public property from those that are essentially governmental, to ensure that private uses carry their fair share of the tax burden. (See *Stadium Concessions, Inc. v. City of Los Angeles* (1976) 60 Cal.App.3d 215, 225 [131 Cal.Rptr. 442] [purpose is to protect public domain from private profit making without tax liability].)[11]

The trial court's ruling did not, as Vanguard suggests, treat Vanguard as if it held a fee simple interest in the entire RCF. The trial court's ruling only put Vanguard on an equal footing with lessees of private property, who indirectly pay property taxes through increased rents. (See *City of San Jose v. Carlson, supra*, 57 Cal.App.4th at p. 1352.)

We conclude that Vanguard retained sufficient authority and control over the CU Space and LCU Space for its use to qualify as "independent."

D. *The "Exclusivity" Requirement*

Vanguard, in arguing that the Alamo and National Leases did not create "exclusive" possessory interests, appears to rely largely on the designation of the CU/LCU Spaces in the leases as "common" areas, distinguishing them from the Exclusive Space. However, these designations are not controlling. (*Sea-Land Service, Inc. v. County of Alameda* (1974) 36 Cal.App.3d 837, 842 [112 Cal.Rptr. 113].) Vanguard also asserts, without citation to the record, that its possession cannot be "exclusive" because it is unable to exclude others who may interfere with its enjoyment of the CU and LCU Spaces.

As discussed *ante*, the current provisions of section 107 no longer embody any requirement that the tenant's possession be " 'exclusive against all the

---

[11] As noted in *City of San Jose v. Carlson*, "at least one court has refused to excuse an organization from a possessory interest tax based solely on its nonprofit status." (*City of San Jose v. Carlson, supra*, 57 Cal.App.4th at p. 1360, citing *Rand Corp. v. County of Los Angeles* (1966) 241 Cal.App.2d 585, 590 [50 Cal.Rptr. 698].)

world, including the rightful owner.' " (*Korean Air Lines, supra,* 162 Cal.App.4th at p. 560.) Section 107, subdivision (a)(3), provides: " 'Exclusive' means the enjoyment of a beneficial use of land or improvements, together with the ability to exclude from occupancy by means of legal process *others who may interfere with that enjoyment.* For purposes of this paragraph, 'exclusive use' includes the following types of use in property: [¶] (A) Sole occupancy or use of property or improvements. [¶] (B) *Use as a cotenant.* [¶] (C) Concurrent use by a person who has a primary or prevailing right to use property or improvements at any time. [¶] (D) Concurrent uses by persons making qualitatively different uses of property or improvements. [¶] (E) Concurrent use by persons engaged in similar uses that diminish the quantity or quality of the property or improvements. [¶] (F) *Concurrent use that does not diminish the quantity or quality of the property or improvements, if the number of those concurrent use grants is restricted.* [¶] A use of property or improvements that does not contain one of the elements in subparagraphs (A) to (F), inclusive, shall be rebuttably presumed to be a nonexclusive use." (Italics added.) (Accord, Cal. Code Regs., tit. 18, § 20, subd. (c)(7).)

■ The examples in the foregoing section illustrate a settled point of law—exclusivity is not defeated by the fact that others enjoy a similar right to make use of the property. (*City of San Jose v. Carlson, supra,* 57 Cal.App.4th at p. 1358; *Korean Air Lines, supra,* 162 Cal.App.4th at p. 569 [dicta];[12] *Euro-Pacific v. County of Alameda* (1992) 11 Cal.App.4th 891, 895, 898 [14 Cal.Rptr.2d 583] [fact that container shipper had no right to exclude other similarly situated container shippers from using facility, and could even be compelled to vacate if idle, "is relevant to the value of the interest, but does not alter the fact that there is indeed a possessory interest"]; *United Air Lines, Inc. v. County of San Diego* (1991) 1 Cal.App.4th 418, 427–429 [2 Cal.Rptr.2d 212]; *Freeman v. County of Fresno* (1981) 126 Cal.App.3d 459, 464 [178 Cal.Rptr. 764].)

Use of the CU/LCU Spaces under the Alamo and National Leases is consistent with section 107's definition of "exclusivity" under both subdivision (a)(3)(B) (use as a cotenant) and subdivision (a)(3)(F) (a restricted number of concurrent use grants that does not diminish the quantity or quality of the property or improvements). Vanguard asserts that its uses fail

---

[12] Contrary to Vanguard's argument, nothing in the *Korean Air Lines* opinion suggests that one airline could exclude all others from the FIS area when in use by that airline. (*Korean Air Lines, supra,* 162 Cal.App.4th at p. 565.)

the exclusivity test of subdivision (a)(3)(F) because "the number of concurrent users is not restricted." However, the lease agreements reflect otherwise—that only a limited number (six) of other rental car companies had similar rights to use the CU Space and LCU Space, and Vanguard cites no evidence that the concurrent use by the six other companies diminished the quantity or quality of the property or improvements. To the contrary, far from diminishing the quality of Vanguard's use, the leases required the other tenants to share the burden for the development, maintenance and repair of the CU/LCU Space improvements, equipment and facilities. It is well settled that shared use of property with others affects only the valuation of the possessory interest and does not defeat the exclusivity requirement of section 107. (*Air China, supra,* 174 Cal.App.4th at p. 19.)

Vanguard further claims, again without support in the record, that these areas were "open to free public access." (See *Freeman v. County of Fresno, supra,* 126 Cal.App.3d at pp. 463–464 ["[t]he requirement that the use must be exclusive means that it must not be one shared by the general public . . ."].) Even if it were true that members of the public could somehow independently gain access to the CU/LCU Spaces, it remains clear that only Vanguard and six other rental car companies had the ability to make commercial use of these areas—a right not shared by members of the general public. In *Scott-Free River Expeditions, Inc. v. County of El Dorado* (1988) 203 Cal.App.3d 896 [250 Cal.Rptr. 504], exclusivity sufficient to establish a taxable possessory interest was found under a county permit granted to a commercial river rafting company. Exclusivity was found notwithstanding the facts that such permits were issued to 80 other similar companies and that members of the public could likewise navigate upon the river, since only those with permits held a "special right of access for profit." (*Id.* at pp. 908–910.)

■ Vanguard had beneficial rights in the CU/LCU areas which members of the public clearly did not share, and which it did share with only a limited number of cotenants in a fashion that restricted neither the quantity of the property nor the quality of its use. Accordingly, we conclude that Vanguard's rights under the National and Alamo Leases were sufficiently "exclusive" to establish Vanguard's possessory interests and to permit taxation.[13]

---

[13] We need not address whether the County properly allocated the tax burden among all of the tenants of the RCF. Vanguard only raises the issue in passing and includes no citation to support in the record or to supporting authority. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481] [if no legal argument with citation to authority " 'is furnished on a particular point, the court may treat it as waived, and pass it without consideration' "].)

## III. Disposition

The judgment is affirmed. Respondent is to recover costs on appeal.

Simons, Acting P. J., and Needham, J., concurred.